Catherine **GANNON**, M.D., Jochen Profit, M.D., Paul Allencherril, M.D., and Baylor College of Medicine, Lisa Havins, MSN, RN, NNP, Carol Anselmo, MSN, RN, NNP, and Texas Children's Hospital, Appellants,

v.

Lamar and Traci **WYCHE**, Individually and on Behalf of Kyla Wyche, a Minor, Appellees.

No. 14–09–00624–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 31, 2010.

Thomas P. Sartwelle, N. Terry Adams, Jr., Robert Eugene Bell, William Howard Whitaker, T. Marc Calvert, Houston, for appellants.

William H. Liebbe, Tyler, for appellees.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

This is a healthcare-liability case governed by chapter 74 of the Texas Civil Practice and Remedies Code.[1] Lamar and Traci Wyche, individually and on behalf of their daughter, Kyla Wyche, sued Catherine Gannon, M.D., Jochen Profit, M.D., Baylor College of Medicine, Paul Allencherril, M.D. (collectively, "the doctors"), Lisa Havins, MSN, RN, NNP, Carol Anselmo, MSN, RN, NNP, and Texas Children's Hospital (collectively, "the nurse practitioners") for alleged medical malpractice.[2] The Wyches served the defendants with expert reports prepared by Harley Aaron Rotbart, M.D., a physician, and NiKole Poulsen Armstrong, RN, MSM, NNP–BC, a neonatal nurse practitioner. The doctors and the nurse practitioners moved to dismiss the Wyches' healthcare-liability claims on the basis of inadequate expert reports, but the trial court denied their motions. This interlocutory appeal followed.

In this appeal, we consider whether Dr. Rotbart properly relied on an unsworn statement allegedly made by Traci Wyche in formulating his opinions. We also consider whether Dr. Rotbart's and Nurse Armstrong's expert reports may be read together to satisfy the element of causation as to the nurse practitioners, even though Dr. Rotbart's causation opinions do not specifically mention the nurse practitioners or the hospital where they work and his report expressly addresses only the doctors. On this record, we conclude

---

1. *See* Tex. Civ. Prac. & Rem.Code §§ 74.001–.507 (Vernon 2005 & Supp. 2009).

2. In their original petition, the Wyches also sued River Oaks Hospital f/k/a Twelve Oaks Hospital, but this entity is not a party to this appeal. The Wyches allege only vicarious liability against the hospitals and Baylor Medical Center.

that Dr. Rotbart could rely on Traci Wyche's statement, but his expert report is inadequate to satisfy the element of causation as to the nurse practitioners even when read together with Nurse Armstrong's report. Accordingly, we affirm in part and reverse and remand in part.

## I

Kyla Wyche was born prematurely on May 5, 2006 and was admitted to Texas Children's Hospital. While at Texas Children's Hospital, Kyla had IVs placed at various sites on her body and at various times. On May 11, 2006, Dr. Catherine Gannon and Carol Anselmo noted that an IV that had been placed in Kyla's left foot had "infiltrated." The area around the IV in Kyla's left foot was puffy, red, edematous, and firm, and the IV was discontinued. On May 12, Anselmo noted a pinpoint-sized green pustule on Kyla's left foot, which she cleansed and cleared. She also discussed it with Dr. Gannon. Neither Anselmo nor Dr. Gannon obtained cultures of the green pus or documented an assessment of the left lower extremity.

On May 13 and 14, Lisa Havins and Dr. Jochen Profit attended Kyla. The Wyches allege that neither documented an assessment, examination, or evaluation of Kyla's left foot and leg, even though her foot continued to appear red, swollen, "tight," and hot. Kyla was discharged from Texas Children's Hospital on May 14. According to the Wyches, the swelling and redness in Kyla's foot continued. By May 20, Kyla's left leg continued to be swollen and red, her left foot was tender and painful, and she had developed a fever. The Wyches took Kyla to the emergency department at Twelve Oaks Hospital, where Dr. Paul Allencherril saw her. Dr. Allencherril diagnosed cellulitis and ordered Kyla Wyche discharged home with a prescription for Amoxicillin.

On May 22, Kyla was seen by a pediatrician who admitted her to Texas Children's Hospital through the emergency room. She was diagnosed with Staphylococcus aureus bacterial infection, cellulitis from left wound drainage, left femoral osteomyelitis and left hip septic arthritis as well as associated thrombophlebitis of the deep left femoral and ileac veins. On May 24, Kyla underwent surgery for left hip excision, irrigation, debridement, and nephrotomy of the left hip, and was treated with a prolonged course of IV antibiotic therapy. The Wyches allege that, because of the delays in diagnosis and timely treatment of the infection that began at the IV site in the left foot, Kyla suffered serious, permanent, and disabling injuries.

## II

On appeal, Dr. Gannon, Dr. Profit, and Baylor College of Medicine contend the trial court erred in denying their motion to dismiss because the opinions in Dr. Rotbart's expert report on standard of care, breach, and causation are based solely on an unsworn, unauthenticated, and undated written statement that is unreliable and untrustworthy on its face, and Dr. Rotbart's reliance on the statement was unreasonable because the assumed facts in the statement are not corroborated by, and conflict with, the medical records. Dr. Allencherril separately appeals, contending in two issues that Dr. Rotbart's report is inadequate because it is based on Traci Wyche's unsworn statement and Dr. Rotbart's opinions are conclusory. Lisa Havins, Carol Anselmo, and Texas Children's Hospital also separately appeal, contending that an expert may not rely on an unsworn statement that contradicts the medical records and that the reports of Dr. Rotbart and Nurse Armstrong fail to address the element of causation as to them. All of the appellants assert that the expert reports constitute "no report at all" as to

them and therefore the trial court had no discretion but to grant their motions to dismiss and award reasonable attorney's fees and costs of court.

We will first address the common issue of Dr. Rotbart's reliance on the alleged unsworn statement of Traci Wyche ("Traci Wyche's statement") and then address the appellants' individual issues.

## A

A medical-malpractice plaintiff must timely serve on each defendant or each defendant's attorney one or more expert reports that set out (1) the applicable standard of care, (2) the manner in which the defendant's care failed to satisfy that standard, and (3) the causal relationship between the defendant's failure and the injury or damages claimed. See Tex. Civ. Prac. & Rem Code Ann. § 74.351(a), (r)(6). The plaintiff may satisfy the statutory requirements by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider. Id. at § 74.351(i). However, only a physician may give opinion testimony about the causal relationship between the claimed injury, harm, or damages and the alleged departure from the applicable standard of care. See id. at § 74.351(r)(5)(C).

Generally, if the plaintiff fails to timely serve an expert report within the statutory deadline the trial court must dismiss the lawsuit with prejudice. See id. § 74.351(b). But if the plaintiff has timely served a report on the defendant, the trial court cannot dismiss the lawsuit unless the report does not represent an objective good-faith effort to comply with the statutory requirements for such a report. See id. § 74.351(1). If an expert report has not been timely "served" because "elements of the report are found deficient," the court may grant one thirty-day exten-

sion to the plaintiff to cure the deficiency. Id. § 74.351(c).

■ We review a trial court's denial of a motion to dismiss under section 74.351 for abuse of discretion. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.2001); Group v. Vicento, 164 S.W.3d 724, 727 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. Larson v. Downing, 197 S.W.3d 303, 304–05 (Tex.2006); Mem'l Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex.App.-Houston [14th Dist.] 2007, no pet.). To the extent resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. Mokkala v. Mead, 178 S.W.3d 66, 70 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

## B

The doctors and the nurse practitioners make a variety of arguments concerning Dr. Rotbart's reliance on Traci Wyche's statement in formulating his opinions. The statement itself is entitled "Traci Wyche Statement," and it contains a day-by-day description of Kyla's condition and symptoms from May 11, 2006, through May 20, 2006, when the Wyches took her to the emergency room at Twelve Oaks Hospital. It concludes with a printed signature block and signature of "Traci Wyche." Two other people signed the statement, and each added "I agree to the statement" next to their signatures. One of the signatures is illegible.

## 1

To understand the appellants' complaints, it is helpful to set out portions of Dr. Rotbart's report reflecting his reliance on Traci Wyche's statement. For exam-

ple, in Dr. Rotbart's report,[3] he lists the medical records he reviewed in forming his opinion, and then he states:

I have also reviewed a statement of Traci Wyche in which she recalls events regarding her daughter Kyla Wyche. For purposes of this report, I assume her statement to be true and correct.

Next, in a section entitled "Review of Facts," Dr. Rotbart recites a chronology of events incorporating information from both the medical records and Traci Wyche's statement. After that, in the discussion section of his report, Dr. Rotbart states the following:

A finding of cellulitis in infants who are less than thirty days old presents an extremely serious situation requiring aggressive and immediate antimicrobial treatment. Initiation of oral antibiotics is simply insufficient to treat this condition and prevent its progression. It is therefore mandatory that infants who are less than thirty days old with cellulitis be immediately hospitalized for IV antimicrobial therapy and consultation with an infectious disease specialist.

Since there are no documented assessments of Kyla Wyche's left lower extremity by the healthcare providers on May 12, 13, or 14, 2006, I cannot determine from the record whether or not the erythema, swelling and induration noted on May 11, 2006 persisted, progressed or resolved. According to Traci Wyche's statement, there was persistence and progression during this period of time. She states that on May 11, 2006 the area where the IV had been was red, swollen and tight. She states that on May 12, 2006 the redness, swelling and tightness persisted and on either May 12 or May 13, the left foot felt hot and blisters were forming. By May 13, 2006 Traci Wyche states that in addition to the area feeling hot, the redness appeared to progress toward the bottom of the foot and appeared to be a little more swollen. She states that on May 14, 2006, the left foot continued to be red, swollen, tight and hot.

Dr. Rotbart then outlines numerous medical record entries he opines support the conclusion that the peripheral IV site in the left foot was the source of the infection in Kyla's left leg. Additionally, he notes that when Kyla Wyche was re-admitted to Texas Children's Hospital on May 22, 2006, there was "significant boney change" which he states is "consistent with an infection untreated for ten days." He further opines that "[h]ad Kyla Wyche received care and treatment of the infection prior to discharge, it is very likely the infection would not have progressed to cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, bacteremia and the other medical conditions which were diagnosed during her hospitalization beginning May 22, 2006.

Dr. Rotbart's report continues with sections setting out the standard of care, breach of the standard of care, and causation for Drs. Gannon, Profit, and Allencherril. Concerning the standard of care for Drs. Gannon and Profit, Dr. Rotbart states:

All previous and new peripheral IV sites should be carefully inspected for

3. In his report, Dr. Rotbart states that he is a professor in the Department of Pediatrics, Section of Pediatric Infectious Diseases, at the University of Colorado School of Medicine, where he is also a professor in the Department of Microbiology. He is vice-chairman of the Department of Pediatrics at The Children's Hospital of Denver and the University of Colorado School of Medicine. He is board certified by the American Board of Pediatrics with a sub-board in Infectious Diseases. An extensive curriculum vitae is attached to Dr. Rotbart's report. The defendants do not challenge Dr. Rotbart's qualifications.

signs of local inflammation, palpable cord or expressed pus. This is especially true in neonates who have peripheral intravenous lines for parenteral nutrition. Infection should be suspected if there are local signs of inflammation (e.g., swelling, erythema, tenderness, induration or purulent discharge) with or without fever.

If signs of local inflammation or pus are found, the findings of local inflammation and/or pus must be documented and the site reassessed on a frequent basis to see if the signs of local inflammation and pus persist, progress or resolve. Persistence, progression or resolution on re-evaluation should also be documented. Documentation is especially important when there is a transfer of care from one healthcare provider to another as occurred in this case so that subsequent providers will be alerted to the problem.

If the signs of local inflammation or pus persist or progress, empiric antimicrobial therapy should be initiated based on Gram stain results when available and should include agents active against Staphylococcus aureus. In addition, blood cultures should be drawn. Exploration and excision of the vein should be carried out if there is insufficient resolution because of the concern of progression to suppurative thrombophlebitis.

Dr. Rotbart then opines that Dr. Gannon breached the standard of care in these ways:

1. Failing to document the condition and appearance of the left foot and leg near the IV infiltrate site. The presence of persistent erythema, swelling and induration has been attested to by Traci Wyche. Documentation of the findings described by Ms. Wyche, or any other findings, was imperative since the care of Kyla Wyche would be transferred to Dr. Profit and Lisa Havins, NNP the following day. Those caregivers needed to be aware of the importance of re-evaluating the left lower extremity.

2. If, in addition to a finding of a green pustule, there was persistent erythema, swelling and induration and the foot was warm or hot to the touch, as attested to by Traci Wyche, then Dr. Gannon breached the standard of care by

(a) failing to document that the foot was warm or hot to the touch;

(b) failing to culture the green pus and obtain blood cultures; and

(c) failing to begin empiric antimicrobial therapy including agents active against Staphylococcus aureus.

Similarly, Dr. Rotbart opined that Dr. Profit breached the standard of care in these ways:

1. Failing to document the condition and appearance of the left foot and leg near the IV infiltrate site to evaluate whether the signs of infection had progressed from the previous day. According to Traci Wyche's statement, the "redness appeared to be going toward the bottom of the foot and it appeared to be a little more swollen than the previous day" and in addition to continuing firmness and induration, the foot felt warm or hot;

2. Upon finding progression of the signs of infection, failing to:

(a) culture any exudates found and obtain blood cultures; and

(b) begin empiric antimicrobial therapy including agents active against Staphylococcus aureus.

3. Failing to cancel the discharge orders for Kyla Wyche and order that her hospitalization be continued for further observation, evaluation and treatment for infection.

Dr. Rotbart then opines that, as a result of these breaches of the standard of care by

Dr. Gannon and Dr. Profit, Kyla was discharged from Texas Children's Hospital without receiving care and treatment for the infection in her left lower extremity. He further states that early care and treatment of localized infection is required for curing the infection and preventing its predictably progressive course if untreated. In reasonable medical probability, he concludes, care and treatment of Kyla's infection before discharge would have prevented the progression of the infection to the other, more severe medical conditions that were diagnosed and treated during her readmission on May 22, 2006.

Dr. Rotbart also separately discusses the standard of care, breach, and causation concerning Dr. Allencherril, the emergency-room physician who saw Kyla on May 20. In summary, Dr. Rotbart states that the standard of care for a reasonable and prudent emergency-room physician required that Kyla, an infant less than thirty-days old with cellulitis, be admitted to the hospital for a complete septic work-up and IV-antibiotic treatment under consultation with a neonatologist and/or infectious disease specialist. Dr. Rotbart opines that Dr. Allencherril breached the standard of care by discharging Kyla from the emergency department with a prescription for oral Amoxicillin, failing to recommend, request and/or order that Kyla be admitted to a hospital for a complete septic work-up and IV antibiotics, and failing to request consultation with a neonatologist and/or specialist in infectious disease for appropriate antibiotic therapy. Dr. Rotbart explains the causal relationship as follows:

> As a result of the breach of the standard of care by Dr. Allencherril, there was a delay of approximately thirty-four hours in the initiation of IV antibiotic treatment for Kyla Wyche. Since Kyla Wyche's infection had already progressed beyond localized IV site infection to at least cellulitis by May 20, 2006, I

cannot quantitate with certainty the degree of subsequent harm and injury that would have been avoided, but in reasonable medical probability, beginning appropriate IV antibiotic treatment on May 20, 2006 instead of May 22, 2006 would have substantially decreased the severity of the infectious complications including the conditions of cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, and bacteremia.

Dr. Rotbart concludes his report with the opinions that all the doctors were negligent in their care and treatment of Kyla and their negligence was a proximate cause of the progression of infection in Kyla's left lower extremity to the more serious conditions.

2

■ The appellants contend that a physician may not reasonably rely on an unsworn, unauthenticated and undated written statement in forming opinions, especially when it is contrary to the actual facts in the medical records. Further, they argue that Dr. Rotbart wrongly assumes Traci Wyche's statement is true and correct, and assert that the statement provides no assurance about the source or reliability of the information conveyed in it or even about the identity of the maker. Without a trustworthy and reliable basis, they argue, an expert's opinions are conclusory and have no value in the eyes of the law. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997) ("If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable."). Some of the doctors further assert that the statement could have been made by anyone, even a janitor.

■ Texas Rule of Evidence 703 permits an expert to base an opinion on facts or data "perceived by, reviewed by, or made known to" the expert. Tex.R. Evid. 703. An expert may even consider inadmissible evidence if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* Thus, in many instances, experts may rely on inadmissible hearsay, privileged communications, and other information that the ordinary witness may not. *In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex. 2007).

■ In *American Transitional Care Centers of Texas, Inc. v. Palacios* the supreme court did not require that an expert report must rise to the level of a summary judgment affidavit or evidence admissible at trial. *See* 46 S.W.3d at 878–79. Instead, the *Palacios* court explained that the expert report need represent only a good-faith effort to provide a fair summary of the expert's opinions. *Id.* at 878. And although the report must include the expert's opinion on each of the elements identified in the statute, it "need not marshal all the plaintiff's proof." *Id.* To constitute a good-faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. As the *Palacios* court stated, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.*

Although the parties have not cited and we have found no reported Texas case on point, several cases are instructive. First, in *Hiner v. Gaspard,* the plaintiff's experts relied on medical records and a statement by the patient's wife recalling events during and after the alleged medical malpractice. No. 09–07–240–CV, 2007 WL 2493471, at *3 (Tex.App.-Beaumont Sept. 6, 2007, pet. denied) (mem. op). On appeal, the defendants argued that the affidavit of the patient's wife was incompetent, hearsay, and based on conclusions, speculation, and assumed facts. *Id.* at *7. The court rejected this argument, stating: "Appellants cite no authorities that hold that an expert who is preparing a report as required by Chapter 74 may not review documents that would not be admissible into evidence at trial. In addition, we note that Chapter 74 provides that any expert reports served 'under this section' are not admissible into evidence and may not be used in 'a deposition, trial, or other proceeding.'" *Id.* The court continued, "Because Chapter 74 prohibits the introduction of expert reports into evidence, the Legislature likely did not intend that expert reports and the evidence reviewed by experts in preparing the reports must comply with the rules of evidence." *Id.* Further, citing Rule 703 of the Texas Rules of Evidence, the court noted that even if the rules of evidence applied, the appellants cited no authorities supporting the proposition that the affidavit of the patient's wife did not support the type of facts or data reasonably relied upon by medical experts in preparing the reports required by chapter 74. *Id.*

In *Comstock v. Clark,* Megan Comstock was given an overdose of sedation medication during a procedure to extract her wisdom teeth and she suffered permanent brain damage as a result. *See* No. 09–07–300–CV, 2007 WL 3101992, at *1 (Tex. App.-Beaumont Oct. 25, 2007, pet. denied) (mem. op.). Dr. Orr, an anesthesiologist, wrote an expert report on causation on

behalf of the plaintiffs. In preparing his report, Dr. Orr reviewed the medical records pertaining to the alleged negligence and spoke with Megan's mother—who was one of the plaintiffs—regarding the events surrounding the procedure and her present condition. *Id.* at *5. The court concluded that Dr. Orr's report sufficiently linked the facts to the healthcare providers' breach of the applicable standards of care. *Id.* In a footnote, the court acknowledged the difference between an expert report's sufficiency for purposes of chapter 74 and admissibility at trial, stating: "We do not imply or suggest that an expert report's sufficiency for purposes of Chapter 74 . . . immunizes the report from a challenge that it is not sufficiently reliable to be admitted before the trier of fact. That type of challenge generally carries with it a more developed record than is before us here in this preliminary proceeding." *Id.* at n. 1.

The doctors and nurse practitioners contend, however, that Traci Wyche's statement lacks the indicia of reliability present in the patient's wife's affidavit in *Hiner* or the direct communication with the patient's mother in *Comstock.* They primarily rely on case law addressing the reliability of the foundation of an expert's opinion at trial. *See Havner,* 953 S.W.2d at 714; *Gong v. Hirsch,* 913 F.2d 1269, 1271–74 (7th Cir.1990); *In re "Agent Orange" Product Liab. Litig.,* 611 F.Supp. 1223, 1246–50 (E.D.N.Y.1985).[4] They cite no authority, however, for the proposition that, for purposes of chapter 74's expert-report requirement, the expert may not rely on information that may not be admissible at trial in formulating his opinions.

Here, Traci Wyche's statement, much like the unsworn communication with the patient's mother in *Comstock,* provides Dr. Rotbart with information concerning Kyla's symptoms both during and after her discharge from Texas Children's Hospital. *See Comstock,* 2007 WL 3101992, at *5. And both the *Hiner* and *Comstock* courts recognized that a trial court's determination of the adequacy of the plaintiff's expert reports is a preliminary proceeding in which the rules of evidence may not apply to either the expert reports or the evidence the experts reviewed in preparing their reports. *See Hiner,* 2007 WL 2493471, at *7; *Comstock,* 2007 WL 3101992, at *5 n. 1. These conclusions are consistent with the *Palacios* court's instruction that an expert report does not

4. We note that Dr. Gannon and Dr. Profit cite as support *Collini v. Pustejovsky,* a medical-malpractice case in which the court held that the plaintiff's expert report failed to demonstrate his qualifications to opine concerning the causal relationship between the prolonged use of the drug Reglan and the development of tardive dyskinesia, a condition that causes involuntary movement of the limbs, face, or tongue. *See* 280 S.W.3d 456, 459–60 & n. 1, 466 (Tex.App.-Fort Worth 2009, no pet.). In that case, the expert's report failed to state that he had any experience or training regarding Reglan or tardive dyskinesia, but the plaintiff argued that his qualifications could be established by the fact that Reglan's manufacturer had disclosed tardive dyskinesia as a known complication and the report also reflected that three physicians had diagnosed the plaintiff with dyskinesia related to her Reglan use. *Id.* at 466. Citing Rule 703 and *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 728 (Tex.1998), the court noted that the expert's report did not provide any background on the experience or training of those physicians which would signal to the trial court that their opinions were reliable. *Id.* The court also distinguished other cases in which courts had held that an expert may rely on the opinions of other experts whose qualifications to render reports or diagnoses had been demonstrated. *Id.* But this case does not involve Dr. Rotbart's reliance on the opinions of other experts, and the appellants do not challenge Dr. Rotbart's qualifications. Further, *Collini* does not address an expert's reliance on a description of the patient's symptoms from the patient herself or her representative.

have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Palacios,* 46 S.W.3d at 879; *see also Packard v. Guerra,* 252 S.W.3d 511, 533–34 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (noting expert's reports are nothing more than a preliminary showing that the plaintiffs have a viable claim that is not frivolous or without expert support).

The appellants also complain that Dr. Rotbart's reliance on Traci Wyche's statement is unreasonable because the "assumed facts" in the statement conflict with the medical records also recited in his report.[5] Specifically, the medical records Dr. Rotbart summarizes in his report show that Kyla was "doing well" when she was initially discharged from Texas Children's Hospital on May 14 and that the redness and infection on Kyla's left hip was not noticed by her mother until May 20, nearly a week later. The appellants also point to Dr. Rotbart's statement that "Since there are no documented assessments of Kyla's left lower extremity by the healthcare providers on May 12, 13 or 14, I cannot determine from the record whether or not the erythema, swelling and induration noted on May 11, 2006 persisted progressed or resolved." Consequently, they assert that Dr. Rotbart improperly relied on "assumed facts" from Traci Wyche's unsworn, unauthenticated statement to opine against them on standard of care, breach and causation.[6]

We conclude, however, that Dr. Rotbart's report does not contradict the medical records. As noted above, Dr. Rotbart explained that the medical records were silent, stating that "there are no documented assessments of Kyla Wyche's left lower extremity by the healthcare providers on May 12, 13 or 14, 2006...." Because the records were silent, Dr. Rotbart uses Traci Wyche's statement regarding the progression of Kyla's symptoms beginning on May 11, 2006, to fill in the gaps.

**5.** The appellants cite *Baptist Hospitals of Southeast Texas v. Carter* to support their contention that Dr. Rotbart's expert report fails to satisfy the statutory requirements because it is based on "assumed facts not contained in or corroborated by medical records." *See* No. 09–08–067–CV, 2008 WL 2917109, at *5 (Tex.App.-Beaumont July 31, 2008, no pet.). In that case, the court of appeals considered operative reports the defendant hospital introduced in evidence to challenge the adequacy of the plaintiff's expert report. *Id.* at *3. The Beaumont court of appeals considered the operative reports, reasoning that "the records the expert acknowledges he reviewed are relevant to a court's determining whether the report adequately relates the facts to the expert's opinion about causation." *Id.* at *4 n. 4. We disagree with this reasoning because it is contrary to the supreme court's instruction that the inquiry regarding the adequacy of an expert report is limited to the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Palacios,* 46 S.W.3d at 878; *see also Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no

pet) (declining to consider defendant's extrinsic evidence that expert was not qualified to opine, noting that the analysis is limited to the four corners of the expert's report and curriculum vitae). Moreover, this case does not involve the admission of medical records to challenge the adequacy of an expert report.

**6.** The Wyches argue that Dr. Allencherril failed to complain below that Traci Wyche's statement was unsworn and unauthenticated, and therefore the argument on appeal is waived. The record below shows that Dr. Allencherril referred to the statement as an "affidavit" and complained only that Dr. Rotbart's reliance on the affidavit rendered his opinions conclusory and insufficient to establish causation. Therefore, we agree that any complaint by Dr. Allencherril that Traci Wyche's statement was unsworn and unauthenticated is waived. *See* T.R.A.P. 33.1(a). Because we conclude that it was not improper for Dr. Rotbart to rely on the statement, however, the outcome of Dr. Allencherril's appeal is the same, with or without this argument.

Moreover, it is undisputed that the medical records Dr. Rotbart summarized showed that on May 11, 2006, the IV previously placed in Kyla Wyche's left foot had infiltrated and "the left leg was red, edematous and firm." The next day, May 12, "a pinpoint sized green pustule" was seen on Kyla's left foot, which was cleaned and cleared. Other medical records noted are consistent in describing Kyla's history of worsening symptoms following the IV infiltrate. Dr. Rotbart's report also specifically addresses how Traci Wyche's statement and the medical record corroborate each other:

> The conclusion that the infection developed at the site of the peripheral intravenous line in Kyla Wyche's left foot and progressed is supported by the statement of Traci Wyche. Additionally, when Kyla Wyche was re-admitted to Texas Children's Hospital on May 22, 2006, there was significant boney change. This finding is consistent with an infection untreated for ten days. With the evidence of progression from the peripheral IV site infection to deep tissue infection—bone, joint, venous and soft tissue—by the time of admission to TCH, it is unlikely that the outward signs of erythema, swelling and induration noted on May 11, 2006, resolved on May 12, 13 and 14, 2006 in a child not on antibiotic therapy. It is more likely than not that these signs and symptoms of local inflammation continued and progressed from May 11, 2006 through the time of her discharge on May 14, 2006 as recalled [by] Traci Wyche. Had Kyla Wyche received care and treatment of the infection prior to discharge, it is very likely the infection would not have progressed to cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, bacteremia and the other medical conditions which were diagnosed during her hospitalization beginning May 22, 2006.

Based on the above, we conclude that the medical records do not contradict Dr. Rotbart's opinion so as to render his opinions unreasonable or unreliable for purposes of chapter 74's expert-report requirement.

■ Even assuming conflicts exist between the facts on which Dr. Rotbart relies and the medical records, the crux of this case is a failure to assess, document, and treat an infection originating at the site of the IV in Kyla's left foot. Accepting the premise that an expert's report may not contradict the medical records in such a case would preclude a plaintiff from ever being able to satisfy the expert-report requirement. Further, the credibility and weight to be given to the facts supporting the expert's opinion is an issue for trial. *See Bidiwala v. Cockerell*, No. 05–08–01156–CV, 2009 WL 866380, at *2 (Tex. App.-Dallas Apr. 1, 2009, no pet.) (mem. op.); *see also LMC Complete Automotive, Inc. v. Burke*, 229 S.W.3d 469, 479 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) (holding that credibility of plaintiff's patient history on which expert relied for medical causation opinion was "a fact issue that goes to the weight, rather than the admissibility, of [the expert's] causation opinion"). Traci Wyche's veracity can be examined and the appellants can present contrary evidence to challenge her claims at trial. At this stage of the proceeding, however, all that is required is that Dr. Rotbart's expert report informs the defendants of the specific conduct the plaintiffs have called into question and provides a basis for the trial court to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 879.

At least one other court has addressed a similar issue. In *Bidiwala v. Cockerell*, Melanie Cockerell fell from a second-story balcony and injured her wrist, ankle, and back. 2009 WL 866380, at *1. She was transported to a medical center where

drug testing showed alcohol and cocaine in her system. *Id.* Melanie was admitted to intensive care with plans for a lumbar fusion in about a week, but over the next two and one-half days, she suffered an undiagnosed pulmonary edema that ultimately led to a drop in blood pressure and cardiac arrest and death. *Id.* In his report, the plaintiff's expert relied in part on the affidavit of Susan Cockerell, Melanie's mother. The expert opined that the standard of care for Dr. Bidiwala, a neurosurgeon who consulted on Melanie's injuries and had planned to perform the lumbar fusion, included the following: " 'Statements made by the patient regarding difficulty breathing should be reported and or charted and brought to the attention of the appropriate physician.' " *Id.* at *2. The expert report further stated:

> If Dr. Bidiwala was present when the patient stated that she could not breathe or was having difficulty breathing, as set out in the affidavit of Susan Cockerell, then Dr. Bidiwala breached the standard of care by not reporting those statements to the attending physicians and by not taking actions to assure that appropriate interventions were begun. Further, there is no evidence in the records that Dr. Bidiwala ever charted those statements of the patient or otherwise reported those statements. Nor is there any evidence that Dr. Bidiwala took any steps to make sure that any interventions including diagnostic tests or other therapeutic measures [were begun].

*Id.* Dr. Bidiwala argued that the only relevant inquiry was whether Dr. Bidiwala heard any statement from Melanie; that the report, on its face, did not indicate that Dr. Bidiwala actually heard the statement; and "the contingent nature of the opinion on the breach of the standard of care" rendered the causation opinions conclusory and insufficient. *Id.* Dr. Bidiwala further argued that the trial court made prohibit-

ed inferences of whether or not a statement made by Melanie was actually heard. *Id.*

After noting that these precise arguments were not made in the trial court, the court addressed Dr. Bidiwala's complaints and affirmed the trial court's order denying his motion to dismiss. *Id.* at *2–3. The court concluded that the trial court did not make any inferences in reading the report. *Id.* at *2. Further, the court noted that the expert, who was not present when the statement regarding breathing was made and therefore could not state as a fact that Dr. Bidiwala was present or heard the statement, "conditioned her opinion on the breach of the standard of care based on facts contained in an affidavit by [Susan Cockerell]." *Id.* Concluding that the expert's reliance on the mother's affidavit did not render the expert's opinions conclusory, the court explained:

> The only inference made was by the expert, who necessarily inferred that if Dr. Bidiwala was present, he heard the statement. Whether Dr. Bidiwala was actually present and actually heard the statements by Melanie is a fact that will have to be litigated later. Here, the report informs the defendant of the specific conduct called into question—failing to report Melanie's statement that she could not breach—and links that breach of the standard of care to causation.

*Id.* Similarly, we conclude that Dr. Rotbart's reliance on Traci Wyche's statement does not render his opinions conclusory or insufficient.

Therefore, we overrule the appellants' appeals to the extent they contend Dr. Rotbart's expert report is inadequate because he relies on Traci Wyche's statement in formulating his opinions.

## C

As noted above, Dr. Allencherril separately appeals the trial court's denial of his

motion to dismiss. He argues in part that Dr. Rotbart's expert report is legally inadequate—as it is based entirely on speculation and conjecture—because Dr. Rotbart relies on Traci Wyche's statement. We have already explained that the trial court did not abuse its discretion in denying the appellants' motions to dismiss on this basis. Additionally, Dr. Allencherril argues on appeal that Dr. Rotbart's opinion is conclusory "on the basis that he uses hindsight and a bad outcome" to establish the standard of care, breach of the standard of care, and causation. As the Wyches point out, however, Dr. Allencherril's only argument in his motion below was the following: "Specifically, by relying upon an affidavit drafted by the Plaintiff, Dr. Rotbart makes assumptions that are conclusory and fail to establish a causal link between alleged failures of Dr. Allencherril and the ultimate alleged injuries experienced by Kyla Wyche." Because we have already disposed of Dr. Allencherril's only preserved complaint on appeal, we overrule his separate issue.

### D

We turn next to the nurse practitioners' appeal of the trial court's motion to dismiss the Wyches' claims against them. Nurse Armstrong's expert report, like Dr. Rotbart's, contains a chronology of events drawn from Kyla's medical-record entries and Traci Wyche's statement. She then sets out the standard of care for nurse practitioners Anselmo and Havins, and separately explains how each allegedly breached the standard of care. In summary, Nurse Armstrong opines that Anselmo and Havins failed to assess Kyla's symptoms, document them, report them to the attending physician, obtain a wound culture, and intervene when the attending physician failed to take appropriate action to treat Kyla as the stated standard of care requires. Nurse Armstrong then concludes by stating that in her opinion, Anselmo and Havins were negligent and failed to provide ordinary care for Kyla.

### 1

On appeal, the nurse practitioners make three primary arguments: (1) Nurse Armstrong is statutorily disqualified from opining on medical causation; (2) Dr. Rotbart's report does not implicate the nurse practitioners and cannot be read together with Nurse Armstrong's expert report; and (3) both Dr. Rotbart's report and Nurse Armstrong's reports are inadequate because they rely on Traci Wyche's statement. The nurse practitioners do not challenge Nurse Armstrong's qualifications or her expert report as to standard of care and breach. Accordingly, the only question is whether the Wyches' expert reports adequately establish the element of causation.

### 2

Chapter 74 plainly requires that only a physician may opine on the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C), 74.403(a); *Kelly v. Rendon*, 255 S.W.3d 665, 675 (Tex.App.-Houston [14th Dist.] 2008, no pet.) ("We agree with appellants that, under the statute, a nurse is not qualified to render an opinion on medical causation."). The Wyches do not dispute this. They argue, however, that Dr. Rotbart's report, when read together with Nurse Armstrong's report, satisfies the element of causation as to the nurse practitioners.

Specifically, the Wyches contend that Dr. Rotbart's report implicates the nurse practitioners because Dr. Rotbart refers to them in his "Review of Facts" as follows:

On May 8, 2006 a peripheral IV was placed in [Kyla's] left foot. On May 11, 2006 Carol Anselmo, NNP noted that

the IV had infiltrated and the left leg was red, edematous and firm. Dr. Catherine Gannon noted on May 11, 2006, "changes in exam: IV infiltrate left leg—puffy, red calf."

On May 12, 2006 Carol Anselmo, NNP noted that there was a pinpoint sized green pustule on the left foot. The area was cleansed with alcohol and the pustule was cleared. Carol Anselmo, NNP noted that she "discussed with Dr. Gannon." Dr. Gannon wrote a note that same day stating that the clinical course and plan of care were reviewed and discussed with the resident/neonatal nurse practitioner, fellow as documented in their note. Neither Dr. Gannon nor Carol Anselmo, NNP documented an assessment of the left lower extremity.

On May 13 and 14, 2006 Lisa Havins, NNP and Jochen Profit, M.D. attended to Kyla Wyche. Neither Lisa Havins, NNP nor Jochen Profit, M.D. made any notes concerning the appearance of the left lower extremity.

Additionally, the Wyches contend Anselmo's and Havins's actions and omissions as set forth in Nurse Armstrong's report are linked to the facts and damages in Dr. Rotbart's report. Nurse Armstrong details their acts and omissions resulting in the failure to treat Kyla's infection, and Dr. Rotbart discusses Anselmo's and Havins's acts and omissions between May 8 and May 14. The Wyches contend that Dr. Rotbart links these acts and omissions in his report in the following paragraphs:

Infection within a vein is a complication that may develop in peripheral intravenous lines for parenteral nutrition. Infection within the lumen of the cannulated vein may become a source of bacteremia and sepsis and may progress to frank suppuration. The signs and symptoms of pediatric patients with an infected vein include swelling, erythema, induration, palpable cord, tenderness, fever, skin that is warm or hot to the touch, and pus. The most frequent signs and symptoms of an infected vein are swelling, erythema and induration. Left untreated, the infection may progress to cellulitis, osteomyelitis, septic hip arthritis and bacteremia as it did in this case.

Peripheral IVs that have infiltrated my progress from infiltration to infection over hours to days. The site must therefore be carefully inspected on a frequent basis for signs of local inflammation, a palpable cord or pus. If these signs are found and persist or progress, empiric antimicrobial therapy should be initiated based on Gram stain results when available and should include agents active against Staphylococcus aureus. In addition, blood cultures should be drawn. Exploration and excision of the vein is indicated if there is progression to suppurative thrombophlebitis. Treatment initiated during the early stages of vein infection prevents progression and development of complications such as cellulitis, osteomyelitis, septic hip arthritis, deep vein thrombosis and septic thrombophlebitis.

. . .

Had Kyla Wyche received care and treatment of the infection prior to discharge it is very likely the infection would not have progressed to cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, bacteremia and other medical conditions which were diagnosed during her hospitalization beginning May 22, 2006.

. . .

Early care and treatment of localized infection is required for curing the infection and preventing its predictably progressive course if untreated. In reasonable medical probability, care and treatment of Kyla Wyche's infection before discharge would have prevented

the progression of the infection to cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, bacteremia and the other medical conditions which were diagnosed and treated during her readmission on May 22, 2006.

Thus, the Wyches contend, Anselmo's and Havins's acts and omission that caused Kyla Wyche's infection to progress into the injuries she sustained are the failure to assess, document, culture, and treat, and Dr. Rotbart's report links the facts of the nurses' failure to assess the infection, document the infection, initiate antibiotics, and collaborate with the attending physician to the progression of Kyla's infection.

To support their contention, the Wyches primarily rely on *Regent Care Center of Laredo, Limited Partnership v. Abrego,* No. 04–07–00320–CV, 2007 WL 3087211 (Tex.App.-San Antonio Oct. 24, 2007) (mem. op.) and *Martin v. Abilene Regional Medical Center,* No. 11–04–00303–CV, 2006 WL 241509 (Tex.App.-Eastland Feb. 2, 2006, no pet.) (mem. op.). In *Martin,* the plaintiff alleged that a doctor and medical center were negligent in discharging him after a cardiac catheterization procedure without a prescription for Plavix. 2006 WL 241509, at *1. The plaintiff provided expert reports of a nurse and a doctor. On appeal, the medical center contended that the reports were deficient regarding causation as to its nurse because the doctor's report addressed only the doctor's negligence. *Id.* at *4. The court rejected this argument, concluding that when read together, the expert reports alleged that if the nurse had informed the doctor of the lack of a prescription for Plavix at the time of the plaintiff's discharge, the doctor should have prescribed Plavix when notified of the omitted prescription. *Id.* at *5.

Citing *Martin,* the court of appeals in *Abrego* reached a similar conclusion. 2007 WL 3087211, at *6. In that case, a nursing-home facility argued that the plaintiffs' expert reports were deficient as to the nursing home's administrator because the plaintiffs' sole expert report prepared by a physician had addressed only the nursing home's negligence and did not specifically mention the nursing home's administrator. *Id.* Relying on *Martin,* the court concluded that when the physician's expert report was read together with the report of the plaintiffs' expert on the standards of care and breaches by nursing home administrators, the reports constituted a good-faith effort to provide a fair summary of the causal relationship between the administrator's actions and the patient's death. *Id.*

▪ We agree that the healthcare-liability statutes do not require a single expert to address all liability and causation issues as to a defendant and the expert reports should be read together when determining whether they represent a good-faith effort to satisfy the statutory requirements. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i); *Packard,* 252 S.W.3d at 526. Nevertheless, we conclude that in this case, even when read together, the expert reports of Nurse Armstrong and Dr. Rotbart do not satisfy the element of causation as to the nurse practitioners. We reach this conclusion for several reasons.

First, although Dr. Rotbart does mention Anselmo and Havins in his review of facts, he does not discuss them or Texas Children's Hospital in the discussion section of his report or in the sections devoted to standard of care, breach of the standard of care, or causation. Further, each section of Dr. Rotbart's report concerning standards of care, breach of the standard of care, and causation is specifically identified by subheadings that specify which doctor's conduct is being addressed. Thus, for example, it contains a section

entitled "Standard of Care for Dr. Gannon and Dr. Profit," "Breach of the Standard of Care by Dr. Gannon," and "Breach of the Standard of Care by Dr. Profit." Similarly, Dr. Rotbart includes sections entitled "Standard of Care for Paul Allencherril" and "Breach of the Standard of Care by Dr. Allencherril." Nowhere in Dr. Rotbart's report does he include a similar section concerning the nurse practitioners. Additionally, the language the Wyches point to as setting out the causal relationship linking Anselmo's and Havins's alleged actions and omissions to Kyla's injuries is contained in a section that is clearly directed only to Dr. Gannon and Dr. Profit, as the paragraph begins: "As a result of the breaches of the standard of care by Dr. Gannon and Dr. Profit as I have outlined above...." Thus, Dr. Rotbart's report contains no allegations concerning causation directed to the nurse practitioners.

■ Moreover, we decline to infer such allegations from Dr. Rotbart's report. An expert is required to explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52. The expert report must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. A trial judge may not draw any inferences, but must rely exclusively on the information contained within the four corners of the report. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878; *see also CHCA Mainland, L.P. v. Dickie,* No. 14–07–00831–CV, 2008 WL 3931870, at *3 (Tex. App.-Houston [14th Dist.] Aug. 21, 2008, no pet.) (mem. op.) ("When determining whether the expert report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the report itself, and inferences are not permitted."); *Patel v. Williams ex rel. Estate of Mitchell,* 237 S.W.3d 901, 904 (Tex.App.-Houston [14th Dist.] 2007, no pet.) ("In determin-

ing whether the report represents a good faith effort, the trial court's inquiry is limited to the four corners of the report, and no inferences may be drawn from information outside the report."). Because the expert reports of Nurse Armstrong and Dr. Rotbart cannot be read to infer an allegation of causation as to the nurse practitioners, we hold that the trial court abused its discretion in determining that these reports satisfied the requirements of section 74.351. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52–53.

We sustain that portion of the nurse practitioners' issue.

**3**

■ Lastly, we turn to the nurse practitioners' contention that because the Wyches' expert reports fail to address the element of causation as to them, the reports amount to "no report at all" and so the trial court abused its discretion in failing to dismiss the Wyches' healthcare-liability claims with prejudice and award the nurse practitioners their attorney's fees and costs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Univ. of Tex. Med. Branch v. Railsback,* 259 S.W.3d 860, 865 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Conversely, the Wyches request that we remand the case to the trial court to consider a thirty-day extension to cure the deficiency.

The nurse practitioners strenuously assert that the Wyches' expert reports cannot constitute a good faith effort—and are equivalent to serving no report at all—because their reports omit the statutory element of causation as to them. *See Rivenes v. Holden,* 257 S.W.3d 332, 334 (Tex. App.-Houston [14th Dist.] 2008, no pet.); *Bogar v. Esparza,* 257 S.W.3d 354, 368 (Tex.App.-Austin 2008, no pet.); *Garcia v. Marichalar,* 185 S.W.3d 70, 73 (Tex.App.-San Antonio 2005, no pet.); *see also Jerni-*

*gan v. Langley,* 195 S.W.3d 91, 93–94 (Tex. 2006) (stating that a mere "passing reference" to a physician in a report, without explanation of how the physician breached the standard of care or caused the injury, would not constitute a sufficient report). These cases and the other similar cases the nurse practitioners rely on, however, involve the expert's failure to mention the complaining defendant at all or only in passing. *See Rivenes,* 257 S.W.3d at 337–38 (expert's report that made no mention of defendant doctor while specifically naming other defendants was not a report at all as to doctor); *Bogar,* 257 S.W.3d at 368 (expert report was no report at all because the defendant doctor was never mentioned and no person's conduct was implicated in report); *Garcia,* 185 S.W.3d at 71–72, 74 (trial court had no discretion to grant an extension when doctor was not mentioned at all in report). They do not stand for the proposition that an expert report that is deficient as to one element is necessarily the equivalent of "no report at all." *Cf. Ogletree v. Matthews,* 262 S.W.3d 316, 324 (Tex.2007) (Willett, J., concurring) ("It is indisputable, for example, that a 'report' signed by a plumber is no report at all and merits swift dismissal, no matter how brilliantly he describes how the defendant's departure from accepted standards of care caused the patient's injury. Likewise, a doctor- or provider-signed record that totally omits the required statutory elements and makes no colorable attempt to demonstrate liability is no report at all and merits dismissal just as swift.").

The nurse practitioners also cite *Hopkins County Hospital District v. Ray,* No. 06–08–00129–CV, 2009 WL 454338 (Tex. App.-Texarkana Feb. 24, 2009, no pet.) (mem. op.), which they contend is "on all fours" with this case. We disagree. In that case, Ray sued Hopkins Hospital after she fell from a hospital bed and was injured. *Id.* at *1. Ray served a report written by a nurse, which Ray represented

was the required expert report. *Id.* At the hearing on the hospital's motion to dismiss, Ray took the position that no expert report was required on causation, and the trial court denied the hospital's motion to dismiss. *Id.* On appeal, the court held that, because the nurse was disqualified by statute to render an opinion on causation, her report was "tantamount to no report at all" and therefore "dismissal was mandatory." *Id.* at *4. *Ray* is distinguishable because in the present case the Wyches have not taken a position obviously contrary to the chapter 74's plain language that no report is required as to causation; instead, they contend that Dr. Rotbart's report satisfies the causation requirement and cite *Martin* and *Abrego,* discussed above, as supporting case law. On these facts, we conclude that, unlike the nurse's report in *Ray,* the Wyches' expert reports were a good-faith, but deficient, effort to comply with the statutory requirements as to the element of causation.

The nurse practitioners cite numerous other cases which they contend advance their position, but they do not cite two recent supreme court cases that inform our analysis: *Leland v. Brandal,* 257 S.W.3d 204 (Tex.2008), and *In re Buster,* 275 S.W.3d 475 (Tex.2008) (per curiam). In *Leland,* the supreme court held that section 74.351's plain language permits one thirty-day extension when the court of appeals finds deficient a report that the trial court considered adequate. 257 S.W.3d at 207–08 (citing Tex. Civ. Prac. & Rem.Code § 74.351(c)). In reaching this conclusion, the court noted that the Legislature, in enacting section 74.351, "struck a careful balance between eradicating frivolous claims and preserving meritorious ones." *Id.* at 208.

In *Buster,* the plaintiff served an expert report signed by a nurse, and the defendant nursing home moved to dismiss on

the ground that a physician's report was required on causation. *Id.* at 476. Before the hearing on the motion, the plaintiff served a supplemental report and moved for a thirty-day extension to allow the supplement to cure the deficiency. *Id.* The trial court granted the extension and denied the nursing home's motion to dismiss. *Id.* On review, the supreme court held that the trial court did not err in granting the extension, noting that "[a] report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30–day extension." *Id.* at 476–77. The court also held that the trial court did not err in allowing the supplemental report from a physician. *Id.* at 477.

Here, the trial court found the reports adequate, and the Wyches relied on case law they believed supported their argument that Dr. Rotbart's report, read together with Nurse Armstrong's report, satisfied the element of causation. On these facts, and applying the reasoning of *Leland* and *Buster*, we overrule this portion of the nurse practitioners' issue.

\* \* \*

On these facts, we agree with the trial court's determination that the expert report of Dr. Rotbart was not inadequate because he relied on the unsworn statement of Traci Wyche in formulating his opinions. We disagree, however, that Dr. Rotbart's opinion, read together with Nurse Armstrong's expert report, satisfied the statutorily required element of causation as to the nurse practitioners. We therefore reverse that portion of the trial court's judgment denying the motion to dismiss of Lisa Havins, Carol Anselmo, and Texas Children's Hospital and remand to the trial court for consideration of the Wyches' request for an extension of time under section 74.351(c) to cure the defi-

ciencies in their expert-report submission. We affirm the remainder of the judgment.