Reversed and Remanded and Memorandum Opinion filed December 9, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00938-CV

___________________

 

Fatima Ibrahim, M.D., Appellant

 

V.

 

Lisa Gilbride and Pete Gilbride,
Appellees



 



 

On
Appeal from the 152nd District Court

Harris County,
Texas



Trial Court Cause No. 2009-25767

 



 

 

MEMORANDUM OPINION

This case is an interlocutory appeal
from the trial court’s order denying appellant, Fatima Ibrahim, M.D.’s, motion
to dismiss the health-care-liability claims filed by appellees, Lisa Gilbride and
Pete Gilbride.  Dr. Ibrahim contends dismissal was mandatory for two reasons:
(1) the Gilbrides did not timely serve their expert’s curriculum vitae (“CV”)
with his report; and (2) the report is insufficient because the expert fails to
(a) establish he is qualified to opine on the applicable standard of care and
(b) adequately explain the applicable standard of care, the manner in which Dr.
Ibrahim allegedly breached the standard, and the causal connection between the
alleged breach and the Gilbrides’ damages.  Because we agree the report is
insufficient but conclude dismissal was not mandatory, we reverse and remand.

I.  Background

The Gilbrides sued Dr. Ibrahim, a neurologist, claiming
she was negligent in her medical treatment of Lisa Gilbride.  In their
petition, the Gilbrides alleged the following: in April 2006, Mrs. Gilbride was
hospitalized for recurrent seizures and thereafter began treatment with Dr.
Ibrahim; despite diagnostic testing in July 2006 confirming ongoing seizure
activity, Dr. Ibrahim failed to prescribe anti-seizure medications; therefore,
in August 2006, Mrs. Gilbride suffered a grand mal seizure, struck her head during
the seizure, and suffered brain hemorrhages and other injuries requiring
emergency brain surgery.

Within 120 days after filing suit, the Gilbrides
served on Dr. Ibrahim an expert report of Donald W. Smith, M.D.  Although Dr.
Smith referenced an “attached” CV, a separate CV was not served with the report. 
Four days after the statutory 120-day deadline for serving an expert report,
the Gilbrides served a separate CV, which they assert was inadvertently omitted
when serving the report.

Dr. Ibrahim filed a motion to dismiss the suit based
on the Gilbrides’ failure to timely serve a CV and on Dr. Ibrahim’s objections
to the sufficiency of the report.  On October 9, 2009, after a hearing, the
trial court signed an order overruling Dr. Ibrahim’s objections and denying her
motion to dismiss.  

II.  Untimely
Service of the Curriculum Vitae

In her first issue, Dr. Ibrahim contends the trial
court abused its discretion by refusing to dismiss the Gilbrides’ claims because
they did not timely serve a CV.

Chapter 74 of the Texas Civil Practice and Remedies
Code governs the Gilbrides’ health-care-liability claims.  See generally
Tex. Civ. Prac. & Rem. Code Ann. § 74.001–.507 (West 2005 & Supp. 2009). 
Under this chapter, “a claimant shall, not later than the 120th day after the
date the original petition was filed,” serve on a defendant physician “one or
more expert reports, with a curriculum vitae of each expert listed in the
report . . . .”  Id. § 74.351(a).  If “an expert report has not been
served within” the 120-day period, on the defendant’s motion, the trial court “shall,”
subject to section 74.351(c), dismiss the claim with prejudice.  Id. §
74.351(b).  If a report is served, a defendant physician must file and serve
any objections to the sufficiency of the report “not later than the 21st day
after the date it was served. . . .”  Id. § 74.351(a).  If an expert
report has not been served within the 120-day period “because elements of the
report are found deficient,” the trial court may grant one thirty-day extension
for the plaintiff to cure the deficiency.  Id. § 74.351(c).

In her motion to dismiss and at the hearing thereon,
Dr. Ibrahim argued that dismissal is mandatory under section 74.351(b) if a
plaintiff fails to serve both an expert report and a CV within the
120-day deadline.  In response, the Gilbrides argued that late service of a CV is
not a ground for dismissal under section 74.351(b); rather, omission of a CV is
merely a deficiency in the served report that the plaintiff is allowed to
correct.  Thus, the Gilbrides suggested that, upon a defendant’s filing a
motion to dismiss based on lack of a timely CV, a trial court may, under
section 74.351(c), grant a thirty-day extension for the plaintiff to cure such deficiency;
see id. § 74.351(c); but, the Gilbrides noted that an extension
would be moot in this case because they had already corrected the deficiency.

In their appellate brief, the Gilbrides contend late
filing of the CV was immaterial because there is a CV contained within the
report.  The Gilbrides express a willingness to rely entirely on the background
and experience Dr. Smith recites in his report to purportedly demonstrate he is
qualified to render his opinions, asserting the report contains more
information regarding his qualifications than the separate CV.          

Although the trial court refused to dismiss the suit,
the basis for its ruling is not exactly clear.  At the outset of the hearing,
the trial court remarked, “But really the only issue for me is the CV because I
think the report is fine,” and asked, “When was the CV provided, and is there
any flexibility?”  After hearing arguments, the trial court remarked, “Well, I
don’t think it is as clear as you [Dr. Ibrahim’s attorney] think it is.  I do
think there is a sanction, but I don’t know what it is.  And, so, I am going to
deny your Motion to Dismiss.”  Based solely on the trial court’s comments at
the hearing, there is no indication it decided the Gilbrides complied with section
74.351(a) because a CV is contained within the report.  Rather, the trial court
indicated there remains some sort of deficiency due to the untimely separate
CV, but the court was not convinced dismissal is required.

Nonetheless, the trial court’s order is silent
regarding the reason it denied the motion to dismiss, and findings of fact and
conclusions of law were not requested or filed.  Therefore, we need not decide
whether failure to timely serve a separate CV mandates dismissal of a
health-care-liability suit because the report contains a CV and we may uphold
the trial court’s order on any legal theory supported by the record. See Thoyakulathu
v. Brennan, 192 S.W.3d 849, 854 n.6 (Tex. App.—Texarkana 2006, no
pet.) (recognizing court of appeals could consider whether
to uphold trial court’s denial of doctor’s motion to dismiss
health-care-liability claim based on failure to timely serve expert report on
any ground supported by record where findings of fact and conclusions of law
were not requested or filed); see also Rosemond v. Al-Lahiq, No.
14-08-00550-CV, 2009 WL 2365650, at *3 (Tex. App.—Houston [14th Dist.] Aug. 4,
2009, pet. filed) (mem. op.) (reciting same principle when evaluating trial
court’s dismissal of suit for failure to timely serve expert report).

As we will later set forth in more detail, we generally
review a trial court’s decision on a motion to dismiss under section
74.351 for abuse of discretion.  Amer.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001);
Baylor Coll. of Med. v. Pokluda, 283 S.W.3d 110, 116–17 (Tex.
App.—Houston [14th Dist.] 2009, no pet.).  However, whether inclusion of an
expert’s CV within the body of his report is sufficient to satisfy section
74.351(a) is purely a legal issue involving statutory construction, subject to de
novo review—albeit an issue of statutory construction that has already been
decided by our court.  See Mokkala v.
Mead, 178 S.W.3d
66, 70 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)
(recognizing that, to the extent resolution of issue pertinent to motion to
dismiss requires interpretation of section 74.351, appellate court applies de
novo standard).

Specifically, our court has held section 74.351(a) is
satisfied if a CV is contained within the report, concluding there is no
requirement in the statute that the report and the CV be separate documents.  See
Univ. of Tex. Med. Branch at Galveston v. Simmons, No. 14-09-00246-CV,
2009 WL 4810296, at *3 (Tex. App.—Houston [14th Dist.] Dec. 15, 2009, no
pet.) (mem. op.) (citing Johnson v.
Willens, 286
S.W.3d 560, 564 (Tex. App.—Beaumont 2009, pet. filed); Harris
County Hosp. Dist. v. Garret, 232 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.]
2007, no pet.); Carreras
v. Marroquin,
No. 13-05-082-CV, 2005 WL 2461744, at *2 (Tex. App.—Corpus Christi
Oct. 6, 2005, pet. denied) (mem. op.)).  Apparently anticipating the Gilbrides’
argument regarding inclusion of a CV within the report, in her own appellate
brief, Dr. Ibrahim acknowledges Simmons but nevertheless suggests Dr.
Smith’s report does not contain a CV.

The
portion of the report pertinent to this issue is the following:

A true and correct copy of my [CV] is attached to this
affidavit and it correctly summarizes my educational background, training and
experience. I attended medical school at State University of New York from 1959
through 1963. Upon graduating from medical school, I entered the United States
Army where I first completed a rotating internship at Martin Army Hospital in
Fort Benning, Georgia. I then completed my residency at Brooke Army Hospital in
San Antonio, Texas. After completing my residency, I was assigned first as a
Brigade Surgeon and ultimately as a Battalion surgeon in Viet Nam where I was
wounded and awarded the Purple Heart. After returning from Viet Nam and
recovering from my injuries, I then served as the Chief of Hospital Clinics in
Japan for three (3) years. After leaving the Army, I began private practice in
1973 and I have continued in private practice through the present.

 

            During
the course of my more than forty (40) years as a medical doctor, I have
diagnosed, treated and managed dozens of patients who suffered from seizure disorders,
and have been actively involved in the care of and treatment of this type of
condition throughout my medical career. I am experienced in and familiar with
the standard of medical care involved in prescribing and managing various
medications used to treat seizure disorders. I am experienced in and familiar
with the use of various modalities of diagnostic testing used in the diagnosis
and treatment of seizure disorders, including the proper use and clinical
interpretation of electroencephalograms and their corresponding reports, and
the applicable medical standard of care for same.

 

The gist of Dr. Ibrahim’s argument is that the above
recitation does not satisfy the CV requirement because it fails to show Dr.
Smith is qualified to render his opinions in the report.  In support, Dr.
Ibrahim cites a portion of Simmons in which our court recognized, the “‘[t]he
purpose of a curriculum vitae requirement is to permit the trial court to
perform its ‘gatekeeper’ function by assessing the qualifications, experience,
and expertise of the expert.’”  Id. at *3 (quoting Carreras, 2005 WL 2461744, at *2).
 Then, when holding that inclusion of the expert’s CV within the report at
issue was sufficient to satisfy section 74.351(a), we noted the defendant
hospital had objected to the plaintiff’s failure to serve a separate CV, but
did not contend the plaintiff’s expert was unqualified or the lack of a separate
CV impeded the defendant’s ability to determine whether the expert was
qualified.  Id.  Despite this notation, the court did not proceed to hold,
as suggested by Dr. Ibrahim, that a CV within a report effectively constitutes
no CV and dismissal is required if the expert fails to demonstrate he is
qualified.  See id.  Therefore, we cannot construe the court’s remarks
as authority for such a proposition.

Under Dr. Ibrahim’s reasoning, dismissal would always
be required when an expert fails to demonstrate he is qualified even if a
plaintiff timely serves a separate CV.  However, this reasoning is contrary to
authority from the Texas Supreme Court recognizing that an expert’s failure to
show he is qualified is a deficiency for which the trial court is authorized,
within its discretion, to grant an extension to correct.  See In re
Buster, 275
S.W.3d 475, 477 (Tex. 2008) (orig. proceeding) (stating, “[a] report by an unqualified
expert will sometimes
(though not always)
reflect a good-faith effort sufficient
to justify a
30-day extension.”);
see also Leland v.
Brandal, 257
S.W.3d 204, 207 (Tex. 2008).

Accordingly, whether Dr. Smith’s report demonstrates
he is qualified to render his opinions therein is another issue, which we
address below.  However, the first paragraph of Dr. Smith’s above-quoted recitation,
summarizing his education and background, although fairly scant, at least
qualifies as a CV, despite his intent to supplement this summary with the
further information contained in his separate CV.  See Simmons, 2009
WL 4810296, at *3 (concluding report included CV although, when summarizing his
specialty and positions of employment, expert stated, “[m]y curriculum vitae is
attached.”).

In sum, the Gilbrides met the threshold requirement
that they serve a CV with the expert report.  Accordingly, the trial court did
not err by refusing to dismiss their claims for failing to timely serve the
separate CV.  We overrule Dr. Ibrahim’s first issue.

III.    
Sufficiency of the Report

In her second issue, Dr. Ibrahim contends the trial
court abused its discretion by refusing to dismiss the Gilbrides’ suit because Dr.
Smith fails to (1) establish he is qualified to opine on the applicable
standard of care for treatment of Mrs. Gilbride’s seizure disorder and (2) adequately
explain the applicable standard of care, the manner in which Dr. Ibrahim
breached the standard, and the causal connection between the alleged breach and
the Gilbrides’ damages.

We employ an abuse-of-discretion standard to review a
trial court’s determinations regarding an expert’s qualifications to render an
opinion in a health-care-liability suit and adequacy of the expert’s report.  Palacios,
46 S.W.3d at 875; Broders v.
Heise, 924
S.W.2d 148, 151 (Tex. 1996); San Jacinto Methodist Hosp. v.
Bennett, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no
pet.).  A trial court abuses its discretion if it acts without
reference to any guiding rules or principles.  Broders, 924 S.W.2d at 151;
Bennett, 256 S.W.3d at 811.  As proponent of the expert, the plaintiff
bears the burden to show the expert is qualified and the expert report
satisfies the statutory requirements.  Memorial
Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007,
no pet.).

A.    Dr. Smith’s Qualifications

For an expert report to satisfy section 74.351, the expert
must be qualified to render the opinions therein.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(r)(5).  Analysis of expert qualifications under section
74.351 is limited to the four corners of the report and the expert’s
CV.  Pokluda, 283 S.W.3d at 117; see Palacios, 46 S.W.3d at 878.

To be
qualified to provide opinion testimony regarding whether a physician departed
from the accepted standard of medical care, the expert must satisfy section
74.401.  See Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(5)(A).  Under section 74.401, the expert must be a physician who:

(1) is practicing medicine at the time such testimony is
given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted
standards of medical care for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim; and

(3) is qualified on the basis
of training or experience to offer an expert opinion regarding those accepted
standards of medical care.

 

Id. §
74.401(a).

To challenge Dr. Smith’s qualifications, Dr. Ibrahim focuses
on the third requirement of section 74.401(a).  In determining whether a
witness is “qualified on the basis of training or experience to offer an expert
opinion regarding” the applicable standards of medical care, “the court shall
consider whether, at the time the claim arose or at the time the testimony is
given, the witness: (1) is board
certified or has other substantial training or experience in an area of medical
practice relevant to the claim; and (2) is actively practicing medicine in
rendering medical care services relevant to the claim.”  Id. §
74.401(c).  Dr. Ibrahim suggests that, applying these criteria, the trial court
could not have concluded Dr. Smith is qualified.

We must note that our evaluation of Dr. Smith’s
qualifications overlaps to some extent with the issue regarding the untimely
separate CV.  In particular, as discussed below, we conclude that the
background and experience recited in Dr. Smith’s report does not show he is
qualified to opine on the accepted standard of care.  The trial court’s
comments at the hearing indicate it did not rely on the separate CV to
determine whether Dr. Smith is qualified because the court remarked “the report
is fine” before even considering the issues concerning the untimely separate
CV.  Nevertheless, because we may uphold the trial court’s order on any ground
that has support in the record, we would need to decide whether a trial court
may consider an untimely CV if the contents of Dr. Smith’s separate CV would
alter our conclusion regarding his qualifications; i.e. whether failure to
timely serve a CV mandates dismissal or instead is merely a deficiency the
plaintiff is allowed to correct.  Accordingly, we will first evaluate Dr.
Smith’s qualifications based solely on his experience outlined in the report,
as urged by the Gilbrides, and then explain why the separate CV does not alter
our conclusion.

1.         Dr.
Smith’s report

Based on Dr. Smith’s report, the first above-cited
criterion of section 74.401(c) is not satisfied because he does not state he is
board certified in any area of medical practice, much less neurology, or list
any “training or experience in an area of medical practice relevant to the
claim.”  See id. § 74.401(c)(1).  We have already quoted the two
paragraphs of Dr. Smith’s report pertinent to his purported qualifications.  In
the first such paragraph, summarizing his education and background, Dr. Smith states
he completed an internship and a residency more than forty years ago but does
not mention any specialty that was the subject of this post-medical-school
training.  Further, Dr. Smith asserts he has been engaged in private practice
from 1973 to the present but does not describe any specialty; in short, we lack
any information regarding the area of medicine he has practiced for the last
thirty-seven years.  

The only mention of any particular areas of medical
practice during his career is Dr. Smith’s statement that, following his
residency and before private practice, he served in the army as a surgeon and
Chief of Hospital Clinics in Japan.  We recognize that, in order to qualify as
an expert in a particular case, a physician need not be a practitioner in the
same specialty as the defendant physician.  Broders, 924 S.W.2d at 153­–54;
Pokluda, 283 S.W.3d at 118.  However, given the increasingly specialized
and technical nature of medicine, not every licensed medical doctor is
automatically qualified to testify as an expert on every medical question.  Broders,
924 S.W.2d at 152.  The test is whether the report and CV establish the witness’s
knowledge, skill, experience, training, or education regarding the specific
issue before the court that would qualify the expert to give an opinion on the
subject at issue.  Id. at 153; Pokluda, 283 S.W.3d at 118–19
(citing Roberts v.
Williamson, 111
S.W.3d 113, 121 (Tex. 2003)).  Dr. Smith fails to describe how he
acquired sufficient knowledge, skill, experience, training, or education while
serving as a military surgeon and Chief of Hospital Clinics to opine on the accepted
standard of care for treatment of seizure disorders, and these positions do not
evince that he is so qualified.

Accordingly, the Gilbrides focus on the second paragraph
of the pertinent portion of Dr. Smith’s report, suggesting Dr. Smith does explain
he has substantial experience in treating seizure disorders.  We would construe
any such explanation as more a description of a type of medical service rendered,
as opposed to an area of medical practice, such as a specialty.  Nevertheless,
because an expert need not practice in the same field as the defendant
physician, in some cases, determining whether the expert has substantial
experience in an area of medical practice relevant to the claim might involve focusing
on the type of medical-care services he has provided instead of merely the name
of his particular practice.  See, e.g., Burrell, 230 S.W.3d at 759–62
(upholding trial court’s ruling that expert was qualified to opine that hospital’s
substandard care caused patient’s decubitus ulcers where expert linked his
specialties to the subject at issue by explaining, over the course of his
career in internal medicine,
occupational medicine, and infectious disease,
he has treated patients with decubitus
ulcers and trained nurses and other personnel in proper techniques
to prevent this
condition).  In this regard, our inquiry concerning the first above-cited criterion
of section 74.401(c) overlaps with our analysis concerning the second criterion:
whether Dr. Smith “is actively practicing medicine in rendering medical care
services relevant to the claim.”  See Tex. Civ. Prac. & Rem. Code
Ann. § 74.401(c)(2).

In the second paragraph at issue, Dr. Smith first
asserts, “[d]uring the course of my more than forty (40) years as a medical
doctor, I have diagnosed, treated and managed dozens of patients who suffered
from seizure disorders, and have been actively involved in the care of and
treatment of this type of condition throughout my medical career.”

Notwithstanding any issues regarding the vague term
“dozens” (whether it means twenty-four or more than 1,000 patients), Dr.
Smith’s statement that he has “diagnosed, treated and managed dozens of
patients who suffered from seizure disorders” does not establish Dr. Smith has
treated these patients for seizure disorders.  This statement could just
as well mean Dr. Smith managed the general healthcare of these patients or treated
them for other conditions and they also suffered from seizure disorders.  

Moreover, Dr. Smith’s statement in the remainder of
the sentence—that he has “been actively involved in the care of and treatment
of this type of condition throughout” his medical career—is vague and
conclusory, especially when considered in the context of the entire sentence.  In
essence, Dr. Smith merely tracks the language of the statutory criterion that
he “actively practices in rendering medical care services relevant to the
claim,” without providing any facts to explain his experience.  “Actively
involved” could mean Dr. Smith has treated patients for seizure disorders.  However,
on the opposite end of the spectrum, “actively involved” could mean that, if a
patient whose general healthcare was managed by Dr. Smith had a seizure
disorder, Dr. Smith referred the patient to a specialist and merely stayed
abreast of the patient’s progress and the medications prescribed, which would
not necessarily render him qualified to opine on the standard of care for such
condition.  As another alternative, “actively involved” could mean Dr. Smith has
referred patients with seizure disorders to other specialists and participated
in deciding the appropriate treatment.

We do not conclude Dr. Smith must necessarily have personally
treated seizure disorders to prove he is qualified to render opinions on the
accepted standard of care in the present case; but without any explanation
regarding the level of his “active[] involve[ment],” in the “care of and
treatment of” seizure disorders, we cannot agree the above-recited statement demonstrates
he possesses “substantial training or experience in an area of medical practice
relevant to” the present claim and “is actively practicing in rendering medical
care services relevant to the claim.”  See Reardon v. Nelson, No.
14-07-00263-CV, 2008 WL 4390689, at *3–4 (Tex. App.—Houston [14th Dist.] Sept.
30, 2008, no pet.) (mem. op.) (holding board-certified anesthesiologist did not
demonstrate he was qualified to opine on accepted standards of care applicable
to cardiovascular surgeon who bypassed wrong artery on plaintiff, despite anesthesiologist’s
statement he has assisted in performing “numerous” cardiac bypass procedures
through providing anesthesia and monitoring patients; his statement,
“[a]nesthesiologists are routinely involved in the planning of the cardiac
procedure conducted in preoperative care” was too conclusory and general to
support a conclusion he was qualified to opine on standard of care for
recognition and identification of vessels to be bypassed in surgery); In re
Windisch, 138
S.W.3d 507, 513–14 (Tex. App.—Amarillo 2004, orig. proceeding)
(holding conclusory statements referencing expert’s qualifications which
tracked language of statute were insufficient to show he was qualified on
subject at hand where he did not provide explanation to bridge gap between positions
he has held and expertise in standard of care for procedure at issue).

In the remainder of the paragraph at issue, Dr. Smith
states, “I am experienced in and familiar with the standard of medical care
involved in prescribing and managing various medications used to treat seizure
disorders.  I am experienced in and familiar with the use of various modalities
of diagnostic testing used in the diagnosis and treatment of seizure disorders,
including the proper use and clinical interpretation of electroencephalograms
and their corresponding reports, and the applicable medical standard of care
for the same.”

These statements are also too general and conclusory
to support a conclusion that Dr. Smith is qualified to opine in this matter.  Again,
the statements essentially track the language of section 74.401(a)(2),
requiring that an expert have “knowledge of accepted standards of medical care
for the diagnosis, care, or treatment of the illness, injury, or condition
involved in the claim.”  See Tex. Civ. Prac. & Rem. Code Ann. §
74.401(a)(2).  However, as we have discussed, Dr. Smith does not explain how he
acquired, or the extent of, his experience and familiarity with the accepted
standards of care for treating seizure disorders.  Without any more detailed
explanation regarding his experience, he has not demonstrated he “is qualified
on the basis of training or experience to offer an expert opinion regarding
those accepted standards of medical care,” as required to satisfy section
74.401(a)(3).  See id. § 74.401(a)(3).

We acknowledge that, under the abuse-of-discretion
standard, we may not substitute our judgment for the trial court’s judgment.  See
Pokluda, 283 S.W.3d at 117 (citing Bowie Mem’l Hosp. v. Wright,
79 S.W.3d 48, 52 (Tex. 2002)).  However, in this case, considering the vague,
general, and conclusory terms used by Dr. Smith to describe his experience, in
conjunction with the lack of any information regarding the areas of medicine he
has practiced for the majority of his career, including the present, we
conclude the trial court acted beyond its discretion if it decided Dr. Smith’s
report shows he is qualified to opine on the accepted standards of care for a
neurologist’s treatment of a seizure disorder.

2.         Dr.
Smith’s separate CV

In his separate CV, Dr. Smith does provide more information
regarding his post-medical school training, the military service mentioned in
his report, and his subsequent private practice.  His internship and residency in
the army involved rotations through “medicine,” pediatrics, obstetrics, general
surgery, pathology, plastic surgery, and rectal and colon surgery.  Through the
remainder of his military service, Dr. Smith performed the following medical-related
responsibilities: served as a surgeon during the Vietnam War; “organized
medical support” for units deploying to Vietnam; studied administration of the
Army Medical Service; served as Chief of Hospital Clinics at an army hospital
in Japan, where he supervised all outpatient care and was senior flight surgeon
during transportation of patients from Vietnam to military hospitals; and served
at the  United States Aviation Safety Center, where he was medical consultant
to the army’s chief aviation safety officer and taught “medical aspects” of
airplane-accident investigation to students in flight-surgeon training.

Following his military service, Dr. Smith held
various positions including the following:  private practice, assisting in
general surgical and gynecological operations; medical consultant to a
corporation; medical director of the Harris County Sheriff’s Department, during
which he supervised medical care of inmates, developed a medical program to
conform the jails to national health standards, and designed medical facilities
for a new jail; and supervisor of the medical program for a large refinery. 
From 1981 to the present, he has served as medical director of the Kuykendahl
Emergency Clinic and is “active in treating minor medical emergencies.”  During
this same time period, he has also served as senior medical examiner for the
Federal Aviation Administration, trained in mobilization medicine at the
Pentagon, and served as medical director for an ambulance company, and is on
the approved-doctors list for the Texas workers’ compensation system.

None of the training, responsibilities, or positions
outlined in Dr. Smith’s CV, including his current practice of treating minor
emergencies, evince he has had substantial training or experience in treating seizure
disorders, although the outlined areas do not all foreclose the possibility he
has such experience.  Therefore, even if Dr. Smith’s CV were considered, he still
would have needed, in his report, to more specifically explain his “active[]
involve[ment]” in the treatment of seizure disorders to attempt to establish “substantial
training or experience in an area of medical practice relevant to” the present
claim.  In addition, he would have needed to provide more information on the
extent of such “active[] involve[ment]” during his current position “treating
minor medical emergencies” to attempt to demonstrate he is “actively practicing
in rendering medical care services relevant to the claim.”  Accordingly, even
if the trial court considered the separate CV and was authorized to do so, we
could not uphold the court’s ruling that Dr. Smith is qualified.

B.     Dr. Smith’s Opinions

An “expert report” is defined as “a written report by
an expert that provides a fair summary of the expert’s opinions as of the date
of the report regarding the applicable standards of care, the manner in which
the care rendered by the physician . . . failed to meet the standards, and the
causal relationship between the failure and the injury, harm, or damages
claimed.”  Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(r)(6).  The expert cannot merely state his conclusions about
these elements but instead must explain the basis for his statements and link
his conclusions to the facts.  Palacios, 46 S.W.3d at 879; Pokluda,
283 S.W.3d at 117.  The trial court should grant a motion
challenging the adequacy of an expert report only if it appears to the court,
after a hearing, that the report does not represent an objective good faith
effort to comply with the statutory definition of an expert report. Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(l).  When determining if a good
faith effort has been made, the trial court is limited to the four corners of
the report and cannot consider extrinsic evidence.  See Palacios, 46 S.W.3d at 878;
Pokluda, 283 S.W.3d at 117.

Dr. Smith provides
the following opinion regarding the required elements:

. . . I have reviewed
the medical records from [Dr. Ibrahim], Northwest Medical Center, other
relevant medical records, and historical clinical information provided by the
patient and her family to provide opinions related to the treatment and care
received by Lisa Gilbride from Dr. Ibrahim.

 

Lisa Gilbride
presented to Northwest Medical Center in June of 2006 and was diagnosed with a
seizure disorder.[1]
Dr. Ibrahim’s treatment and care of Mrs. Gilbride began in the hospital and continued
after she was released. In July of 2006, Dr. Ibrahim ordered a sleep deprived
electroencephalogram.  The test was performed on or about July 19, 2006. The
results were abnormal, documented the presence of focal cerebral dysfunction,
and revealed that Mrs. Gilbride was suffering from ongoing seizure activity. On
or about July 27, 2006, during an appointment with Mrs. Gilbride, Dr. Ibrahim
reviewed the findings of the test with her, but failed to prescribe any
anti-seizure medications. In August of 2006, Mrs. Gilbride suffered a grand mal
seizure, struck her head on the ground, and suffered a brain aneurysm, a
subdural hematoma, and bleeding in the brain that required emergency brain
surgery. 

 

In my opinion, the
treatment and care received by Mrs. Gilbride from Dr. Ibrahim fell well below
the required standard of medical care. The medical records from Mrs. Gilbride’s
hospitalization in June of 2006, the clinical records from Dr. Ibrahim, and the
results of the electroencephalogram demonstrate a patient who was suffering
from a seizure disorder with ongoing seizure activity. Based on this information,
in my medical opinion the applicable standard of care required Dr. Ibrahim to
prescribe appropriate anti-seizure medications. Dr. Ibrahim’s failure to prescribe
appropriate anti-seizure medication was a clear deviation from the applicable
standard of care. In my medical opinion, Dr. Ibrahim’s deviation from the
applicable standard of care was a breach of the duties she owed Mrs. Gilbride
to provide appropriate medical treatment, resulting in medical negligence by
Dr. Ibrahim in the treatment and care of Mrs. Gilbride. 

 

As a direct and
proximate result of the foregoing deviations from and breaches of the applicable
standard of medical care, Mrs. Gilbride suffered a grand mal seizure and the
resulting brain injuries described above. In reasonable medical probability,
had she received proper care and treatment, as described above, she would not
have suffered a grand mal seizure in August of 2006 or the resulting brain
injuries described above.

 

The extent of Dr. Smith’s opinion regarding Dr.
Ibrahim’s alleged negligence and causation is that, after testing revealed “a
seizure disorder with ongoing seizure activity,” Dr. Ibrahim failed to prescribe
“appropriate anti-seizure medications,” and Mrs. Gilbride suffered a grand mal
seizure as a result of the untreated disorder.

We conclude that the terms “seizure disorder with
ongoing seizure activity” and “appropriate anti-seizure medications” are too
vague and general for the report to provide sufficient information regarding
the accepted standard of care and alleged breach.  We recognize an expert report
need not marshal all the plaintiff’s proof; but it must provide enough
information to fulfill two purposes: (1) inform the defendant of the specific
conduct the claimant has called into question; and (2) provide a basis for the
trial court to conclude the claims have merit.  Palacios,
46 S.W.3d at 878–79; Pokluda, 283 S.W.3d at 117.  Without more
specifically identifying the “seizure disorder” suffered by Mrs. Gilbride and
the pathological basis for the disorder, Dr. Smith could not have adequately informed
a neurologist such as Dr. Ibrahim why medication was the only option for treatment,
or even a viable option, much less what “appropriate” medication should have
been prescribed.  In essence, the report repeats, without more, the allegations
in the Gilbrides’ petition regarding the standard of care and alleged breach,
as well as causation.

Additionally, Dr. Smith references an appointment during
which Dr. Ibrahim reviewed the test results with Mrs. Gilbride.  However, Dr.
Smith does not reveal any substance of their conversation, particularly whether
Dr. Ibrahim and Mrs. Gilbride discussed medication as a treatment option and the
benefits versus risks of such medication; and if the subject of medication was
discussed, whether it was Mrs. Gilbride’s, Dr. Ibrahim’s, or a joint, decision
that medication would not be used to treat Mrs. Gilbride’s disorder and the
factors forming the basis for such a decision.  Therefore, Dr. Smith’s mere reference
to the visit leaves unanswered the question of whether Dr. Ibrahim failed to recognize
medication was necessary to treat the disorder or whether an informed decision
was made by Mrs. Gilbride, Dr. Ibrahim, or both that medication should not be
prescribed.  Consequently, Dr. Smith does not sufficiently provide the trial
court with a basis for concluding Dr. Ibrahim breached the accepted standard of
care by suggesting she simply neglected to treat an obvious seizure disorder
while omitting any details of the consultation between doctor and patient that
may have affected Dr. Ibrahim’s decision regarding treatment.

Our conclusion regarding Dr. Smith’s opinion on
causation relative to the grand mal seizure is interrelated with our analysis
regarding his opinion on the accepted standard of care and alleged breach.  Dr.
Smith fails to identify the seizure disorder suffered by Mrs. Gilbride and its
pathology and thus show that medication was a necessary and potentially
effective treatment, or specify the medication that allegedly should have been
prescribed. Therefore, although “anti-seizure medications” are indubitably
intended to prevent seizures, Dr. Smith does not sufficiently inform Dr.
Ibrahim and the trial court why such medication would necessarily have prevented
Mrs. Gilbride’s seizure.  Accordingly, we cannot hold the trial court acted
within its discretion by finding the report adequately demonstrates a causal
connection between Dr. Ibrahim’s alleged breach and Mrs. Gilbride’s grand mal
seizure.[2]

In sum, because the trial court abused its discretion
by determining Dr. Smith is qualified and that his report complies with the
requirements for an expert report, we sustain Dr. Ibrahim’s second issue.

IV.   Conclusion

If an expert report has not been timely served
because elements of the report are found deficient, the court may grant one thirty-day
extension to the plaintiff to cure the deficiency.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(c). If a court of appeals
determines a report deemed adequate by the trial court is in fact deficient,
the court of appeals may remand the case for the trial court to decide whether
to grant such an extension.  Leland, 257 S.W.3d at 207; Gannon v.
Wyche, 321
S.W.3d 881, 898–99 (Tex. App.—Houston [14th Dist.] 2010, pet. filed).
 The trial court should consider on remand whether Dr. Smith’s attempt to
satisfy the statutory requirements for expert qualification and explanation of
the accepted standard of care, the alleged breach, and causation constituted a good-faith
effort warranting a thirty-day extension.

Accordingly, we reverse the trial court’s order and
remand for further proceedings consistent with this opinion.

 

 

                                                                                    

                                                            /s/                    Charles
W. Seymore

                                                                                    Justice

 

 

Panel consists of Justices
Anderson, Frost, and Seymore.









[1] The Gilbrides allege Mrs.
Gilbride was hospitalized in April 2006, but Dr. Smith indicates the
hospitalization occurred in June 2006.  Nevertheless, this variance is
immaterial to our analysis.





[2]
The Gilbrides and Dr. Smith claim Dr. Ibrahim’s
alleged negligence caused both the grand mal seizure and Mrs. Gilbride’s other
brain injuries, including aneurysm, subdural hematoma, and bleeding, which
required emergency surgery.  However, with respect to these other brain injuries,
it is not exactly clear from the petition and report whether they claim (1) the
untreated seizure disorder directly caused both the seizure and some or all of
the other brain injuries, (2) the untreated seizure disorder caused the seizure
which, in turn, caused some or all of the other brain injuries, or (3) some or
all of the other brain injuries resulted from Mrs. Gilbride’s striking her head
during the seizure.  The Gilbrides seek damages not only because Mrs. Gilbride
suffered a seizure but also because she required surgery to repair the other
brain injuries.  Nonetheless, regardless of which scenario is claimed, the gist
of Dr. Ibrahim’s motion was that Dr. Smith failed to adequately explain a
causal relationship between Dr. Ibrahim’s alleged negligence and the grand mal
seizure.  Although Dr. Ibrahim complains for the first time in her appellate
reply brief that a brain aneurysm is not caused by a seizure and Dr. Smith
failed to explain any causal connection, Dr. Ibrahim did not specifically argue
in her motion that Dr. Smith failed to adequately explain a causal relationship
between any negligence and the other brain injuries.