**Affirmed and Memorandum Opinion filed August 9, 2022.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-20-00186-CV

---

**REGINA ANN VARKEY, INDIVIDUALLY AND AS THE REPRESENTATIVE OF THE ESTATE OF ANIL C. VARKEY, DECEASED AND ANGELINA GINA VARKEY, Appellants**

**V.**

**DR. AYYASH Y. MELHEM, MD; HYE JUNG LEE, RN; TENAKA M. BASILE, RN; AND SAMUEL S. DIZON, RN, Appellees**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-11347**

---

## MEMORANDUM OPINION

In this health care liability case, appellants, family members of a deceased patient, challenge the trial court's final judgment dismissing wrongful death and survival claims against appellees health care providers (a doctor and three nurses) based on deficiencies in their expert reports. After review, we conclude the expert reports are deficient in various respects: as to one nurse, the reports lack baseline

details to discern the factual basis of the claim; as to a claim against another nurse, the reports only provide opinions on two of the three required elements (standard of care and breach); and as to all the health care providers, the reports lack a causation opinion that supports the wrongful death claims asserted in the case. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of February 11, 2017, for the third time in three months, Anil Varkey's failing health brought him to Memorial Hermann Health System d/b/a Memorial Hermann Southeast (MHS).[1] When he first arrived, he complained of left-foot pain joined by a foul odor and drainage; emergency room records report a "large gaping ulcer" on his left heel. The infection was new, but his foot issue, along with a host of other health concerns, had been ongoing. Varkey, 47-years old at the time of his hospital admission, was on record for having "multiple falls, unsteady balance and gait, hypertension, diabetes, renal failure, congestive heart failure, stent placement, and vision impairment. His "active problems" included: cellulitis, clostridium difficile, diabetes, end-stage renal disease on hemodialysis, hypertension, and MRSA. By the early morning hours the next day, when X-rays revealed a new calcaneal facture, Varkey's emergency room doctor transferred him to the hospital.

During his stay, Mr. Varkey was seen by various MHS nurses and physicians, including the appellees — Taneka Basile, Samuel Dizon, Hye Jung Lee, all registered nurses (the "Nurses"), and Dr. Ayyash Melhem, a hospitalist. Chronologically, they were involved with Varkey as follows:

- Nurse Basile cared for Varkey during his emergency room stay. The

---

[1] All facts regarding the treatment discussed here derive from what is provided in the expert reports at issue.

report indicates that Basile first assessed Varkey's fall risk, scoring Varkey at a "0" or as a "low fall risk". [2]

- Dr. Melhem admitted Varkey into the hospital after conferring with Varkey's emergency room doctor. Melhem reviewed Varkey's medical records, prepared his "history and physical" in consultation with Mr. Varkey, and ordered additional medications. It is unclear whether cardiac monitoring was ordered due to lack of documentation.

- Nurse Dizon cared for Varkey during his hospital stay. The expert report indicates Nurse Dizon conducted a fall assessment, but does not indicate the time or score for any such assessment.

- Nurse Lee also cared for Varkey during his hospital stay. According to the expert report, Lee administered medications twice the night before he was found on the floor, and conducted a fall assessment the night before.

On February 13 at 5:20 a.m., Varkey was assisted to the bathroom by a different nurse. Approximately 40 minutes later, he was found on the floor of his hospital room in cardiac arrest. Though he was resuscitated, he suffered an anoxic brain injury, was intubated and placed on mechanical ventilation. He was transferred to a local rehabilitation facility where he passed away on March 9, 2017.

*Lawsuit*

Mr. Varkey's widow, Regina Ann Varkey, appearing individually and as personal representative of his estate and his daughter, Angelina Gina Varkey

---

[2] The score was assessed under the Johns Hopkins Fall Risk Assessment Tool.

(collectively the "Varkey Parties") brought a health care liability lawsuit against MHS and various doctors and nurses, including appellees, (collectively the "MHS Parties") that cared for Mr. Varkey during his last stay. Their petition alleges that the MSH Parties failed to assess Mr. Varkey's fall risk and failed to implement and enforce policies and procedures related to the management, treatment and care of "patient[s] with known health issues". Aiming to comply with Chapter 74, upon filing their petition, the Varkey Parties served reports from two experts: Dr. John Darren Clark, MD, and Madison Chollett, RN, BSN.

After answering the lawsuit, the Nurses successfully objected to the expert reports. The court ordered that Varkey cure deficiencies in the reports, prompting Varkey to serve new reports from each expert.

Unsatisfied with the changes, the Nurses again filed motions to dismiss based on deficiencies in the amended reports. The Nurses argued that the two expert reports failed to address the standards of care and alleged breaches of those standards of care with sufficient specificity as to each nurse. The Nurses also asserted a two-pronged attack on the amended reports' causation opinions: challenging Chollett's qualifications as a nurse to render an expert causation opinion, and challenging Clark's causation opinions as conclusory.

Dr. Melhem also filed a motion to dismiss based on alleged deficiencies in the amended reports. Melhem argued that Dr. Clark's reports failed to provide a good faith summary of his opinions as to the standard of care, breach and causation applicable to Dr. Melhem.

The trial court issued orders granting both motions to dismiss, which form the basis Varkey's appeal, claiming that the trial court abused its discretion.[3]

---

[3] Upon inspection of the record, we determined that the case lacked finality in the absence of

The only issue before us is whether the trial court abused its discretion in granting the Nurses' and Dr. Melhem's motions to dismiss based on deficient expert reports.

## A. Standard of Review

We apply an abuse-of-discretion standard when reviewing a trial court's decision as to the adequacy of an expert report. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). The trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Although we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts. *Id.*; *Sanjar v. Turner*, 252 S.W.3d 460, 463 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## B. The Expert Reports

### *Chollett's standard of care and breach opinions offered to support the claims against Dizon, Lee and Basile*

Chollett's[4] Report sets out standards of care for two stages of nursing care:

nonsuit orders relating to other defendants and unaddressed requests for attorneys' fees. The appeal was abated to allow the parties an opportunity to bring those matters to judgment. The trial court signed orders on July 18, 2022 that disposed of all claims, resulting in a final judgment.

[4] Chollet's report and CV show that she is a licensed nurse with a bachelor's degree (with the relevant nursing coursework) practicing as a charge nurse and nurse assistant manager at HCA Houston Healthcare Clear Lake. Her eight and a half years of nursing experience have been "in the acute care clinical setting where she has worked with telemetry, orthopedic, and fall risk patients." In the area of fall-risk assessment and care, Chollett's report and CV establish that she has evaluated hundreds of patients for fall risks, that she regularly uses "such tools as the John Hopkins Fall Risk Assessment Tool to calculate fall risk scores", that she regularly teaches others how to use it, that she has attended hospital fall-risk analyst meetings, and developed her

the first stage—fall risk-assessment, and the second stage—the implementation of precautions and interventions after appropriate assessments are made. The report provides that appropriate fall risk assessment is generally consistent with an accurate application of the Johns Hopkins Fall Risk Assessment Tool, which requires evaluation of any procedure performed on a patient, specific comorbidities, medications, fall history, and other categories. If the score of the assessment yields a "high fall risk patient", implementation of interventions such requiring that a nurse be in arms-length distance when out of bed, nurse assistance when the patient is walking, making a bedside commode available when two nurses are not available to assist, and the activation of a bed alarm or monitor when patient is up without assistance. Chollett's report also sets out other implementation standards, such that the nursing staff act "as a patient advocate", "delegate tasks", and "give medications as ordered".

Breach of the standards of care is set out in the "conclusion" section, where the report states that each of the Nurses "failed to perform a correct fall risk assessment according to the Johns Hopkins Fall Risk Assessment Tool", and that "each failed at varying times to consider the fact that Mr. Varkey had a history of multiple falls, an unsteady gait, a new fracture in his left foot. . .".[5]

***Clark's causation opinions offered to support the Varkey Parties' claims against Dizon, Lee and Basile***

Dr. Clark's[6] second expert report adopts the standard of care and breach

---

hospital's post-fall checklist.

[5] Because Chollett's amended report does not contain any causation opinions, the issue as to whether her qualifications permit her to render such opinions is moot.

[6] Dr. Clark's report and CV show that he finished his residency as a Chief Resident in an internal medicine program, that he has 20-years' experience practicing as a hospitalist, is board-certified in internal medicine and hospice and palliative medicine, served as a member and in leadership positions in medical organizations devoted to hospital medicine, where he has served on several

6

opinions of Chollett's report, and without specifically naming any of the Nurses, provides as follows:

> It is my expert medical opinion based upon a reasonable degree of medical certainty that if the nurses identified in the expert report of Madison Chollett, RN, BSN had recognized Mr. Varkey as being a patient at high risk of falls, he would have had increased safety measures in place and more frequent monitoring from the nursing staff and his fall would have been recognized sooner or never happened. The failure to provide this patient with a room sitter, the failure to place the patient in direct view of the nursing station (when possible), the failure to activate the patient's bed alarm, and the failure to adhere to physicians orders when administering pain medications were each substantial acts of negligence that individually or collectively increased the risk of falls and resulted in the nursing staff having no idea just how long Mr. Varkey had been lying on the floor of his hospital room in cardiac arrest before the nurses found him and called a Code Blue.

> A pulse was able to be restored with resuscitation, but the severity of his brain damage was far too extensive to support life and Mr. Varkey succumbed to his highly preventable and foreseeable injuries on March 9, 2019.

> It is unknown exactly how long Mr. Varkey was on the floor experiencing cardiorespiratory arrest. He had apparently been assisted to the bathroom at around 5:20 AM, and that was the last contact documented with Mr. Varkey from the nursing staff. He could have easily been on the floor without effective blood flow for over 30 minutes.

> The failure of the nurses to appropriately recognize Mr. Varkey as a high fall risk certainly delayed the time that it took before he was discovered on the ground and thus would increase the chance of death or severe neurological injury from anoxic encephalopathy due to delayed administration of resuscitative measures.

> In other words, every minute that Mr. Varkey was on the ground

committees including a peer review committee. The report states he is familiar with the standard of care and best practices for patient safety, and that he regularly cares for patients presenting with multiple serious medical conditions.

without being recognized made him more likely to suffer death or severe neurological impairment from his cardiac arrest. In all reasonable medical probability, if he would have been recognized as a high fall risk and had been monitored with a cardiac monitor, as was apparently the routine on that floor, then his fall and/or cardiac arrest would have been recognized immediately leading to code blue activation and prompt administration of resuscitative measures that would have re-established circulation for Mr. Varkey and prevented his prolonged lack of oxygen and anoxic brain injury.

This would have improved the response time to his cardiac arrest, and resuscitation would have started sooner, resulting in increased chance of survival and decreased risk of brain injury

In all reasonable medical probability, if Mr. Varkey had been properly assessed as a high fall risk and treated as such, his cardiac arrest would have been recognized much sooner, leading to quicker intervention. such, as defibrillation, medications, and CPR, with improved likelihood of survival and less likelihood of brain injury.

### *Clark's standard of care and breach opinions, and causation opinions offered to support the Varkey Parties' claims against Dr. Melhem*

Clark's first report is the only report that relates to the Varkey Parties' claims against Dr. Melhem. Though Dr. Melhem is only mentioned by name in the background section, he is described as Varkey's admitting physician in that section and his opinions on standard of care, breach and causation pertain to health care at the time of his admission. Clark's first report provides that the standard of care, in light of Varkey's known medical issues at the time of his admission, required that (a) Varkey should have been placed on a continuous cardiac monitoring, and that (b) Varkey should have been classified as a high fall risk.

In turn, as to breach of the continuous monitoring standard, Clark opines that "failing to monitor a patient like Mr. Varkey with end-stage renal disease, history of premature ventricular contractions and tachycardia, and known cardiomyopathy would fall below the standard of care". Clark also opines because it was not clear from the medical records and affidavits if such monitoring was ordered that *if it*

8

*was ordered*, it was a violation of the standard of care not to have that documented by the nursing staff.[7]

As to breach of the fall-risk standard, the report states "[Varkey's] inaccurate fall risk scoring and lack of more aggressive interventions to decrease the risk of fall is a violation of the standard of care."

The section of report titled "Proximate Cause" begins by noting that Varkey was "found on the floor without a pulse", "successfully resuscitated", but "suffered severe brain injury from lack of effective blood flow and oxygenation to his brain" and "was eventually discharged to a rehabilitation facility but ultimately died from his injuries." The section goes on to analyze the causes of the cardiac event: first discarding causes he considers unlikely such as acute myocardial infraction, pulmonary embolism, acute coronary syndrome, sepsis before concluding "more likely than not, the cause of [Varkey's] cardiorespiratory arrest was fatal cardiac arrythmia." The report states that had Varkey's heart been properly monitored his "arrest and suspected arrhythmia would have been recognized sooner." Like his causation opinions for the Nurses, Clark's concluding paragraph applicable to Dr. Melhem causally link alleged breaches of the standard of care with "improved" or "increased" "chances" or "likelihood" of not dying or suffering his injuries:

> [I]f Mr. Varkey had been recognized as being a patient at high risk of falls, he would have had increased monitoring from the nursing staff and his fall would have been recognized sooner. This would have improved the response time to his cardiac arrest, and resuscitation would have started sooner, resulting in increased chance of survival and decreased risk of brain injury. If, as stated by Mr. Varkey's wife and friend, he had cardiac monitoring in place that was not being attended to by the nursing staff, that is certainly a significant violation

---

[7] Although there's nothing in the medical records to indicate that Vasrkey was on continuous cardiac monitoring, affidavits from family members state that cardiac leads had been attached to Varkey.

of the standard of care.

In all reasonable probability, if Mr. Varkey was on continuous cardiac monitoring that was being effectively managed by the nursing staff, and/or if he had been properly assessed as a high fall risk and treated as such, his cardiac arrest would have been recognized much sooner, leading to quicker intervention such as defibrillation medications, and CPR, with improved likelihood of survival and less likelihood of brain injury.

## C. Chapter 74's "Good-Faith" Requirements

Under section 74.351, a claimant, not later than the 120th day after the date a health-care liability claim is filed, must serve on each party one or more expert witness reports addressing liability and causation. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j); *Lewis v. Funderburk*, 253 S.W.3d 204, 205 (Tex. 2008). The statute defines an "expert report" as

[A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). A trial court shall grant a motion challenging the adequacy of the expert report if the report is not an objective good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *Id.* §§ 74.351(*l*), (r)(6). The law limits the trial court's inquiry to the four corners of the report. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

The report must contain sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the plaintiff's claims have merit. *See id.* at 539. Omission

of any of the statutory elements prevents the report from being a good-faith effort. *See id.* A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *See id.* In providing the expert's opinions on these elements, the claimant need not marshal evidence as if actually litigating the merits at trial or present sufficient evidence to avoid summary judgment. *See id.*

A trial court must grant a motion to dismiss a plaintiff's suit if it appears to the court that the expert report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(l), (r)(6). If the plaintiff fails to serve a timely and compliant expert report, then the trial court shall dismiss the claim with prejudice and shall award reasonable attorney's fees and costs to the defendant. *Id.* § 74.351(b).

A compliant report must include an explanation of the basis for the expert's statements and link the expert's conclusions to the facts. *Wright*, 79 S.W.3d at 52; *Gannon*, 321 S.W.3d at 897. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Palacios*, 46 S.W.3d at 879; *see Wright*, 79 S.W.3d at 53.

To comply with these requirements, and constitute a "good-faith effort," a report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *Gannon v. Wyche*, 321 S.W.3d 881, 889 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The report need not marshal all of the plaintiff's proof, but the report must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878–79. Finally, we note "multiple expert reports may be read

11

together" to determine whether the statutory requirements have been met. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); Tex. Civ. Prac. & Rem. Code. § 74.351.

**D. As to each health care provider, did the trial court abuse its discretion in concluding that the experts' opinions on standard of care, breach of the standard of care, or causation were so deficient to fall short of an objective good-faith effort to comply with section 74.351(r)(6)'s definition of an expert report?**

**1.  The reports fail to identify particular facts to support a claim against Nurse Dizon.**

The Nurses argue that the trial court's dismissal of the claims against them was proper because the reports lack specificity. *See Norris v. Tenet Houston Health Sys.*, 14-04-01029-CV, 2006 WL 1459958, at *3 (Tex. App.—Houston [14th Dist.] May 30, 2006, no pet.) ("An expert report asserting that multiple defendants are negligent must explain how each defendant specifically breached the standard and how that breach caused or contributed to the plaintiff's injury."). Clark's report fails to identify the Nurses individually.  His second report refers to the Nurses generally as "the nurses identified in the expert report of Madison Chollett, RN, BSN".  Chollett's report states that Nurse Basile conducted the first fall risk assessment which she recorded a "0" score.  The report also states that Nurse Lee assessed Mr. Varkey's fall risk early in the same shift "that Mr. Varkey was found down and went into cardiac arrest" recording a score "at a low level", but later that Lee changed the score after the fall to an "8".  The report notes that other assessments were made, the time they were made, and the scores, but the report does not clearly connect any of these other assessments to any particular nurse. Adding to the confusion, the combined reports refer to at least one other MHS nurse that cared for Varkey during his hospitalization.

Chollett's report mentions Nurse Dizon by name only in the conclusion

section of her report, but in that section only identifies Dizon in conjunction with the other nurses, e.g., "Nurse Hye Jung Lee, RN, Nurse Samuel Dizon, RN and Nurse Tenaka Basile, RN while caring for Mr. Varkey deviated from the standard of care by failing to perform a correct fall risk assessment". In none of these instances that Dizon's name is mentioned, does the report point to any specific fall assessment Dizon performed for Mr. Varkey.

The Varkey Parties argue that Chollett's report sufficiently identifies Dizon's conduct, including the particular fall assessments he performed by reference to medical records attached as an exhibit to her report.

While Chollett's report attaches an exhibit that includes pages of medical records which contain Dizon's name, the law precludes us from considering such materials as within the "four corners" of her report. *Kingwood Specialty Hosp., Ltd. v. Barley*, 328 S.W.3d 611, 617–18 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Norris v. Tenet Houston Health Sys.*, 14-04-01029-CV, 2006 WL 1459958, at \*2 (Tex. App.—Houston [14th Dist.] May 30, 2006, no pet.). By failing to describe any particular fall assessment performed by Dizon that constituted a deviation from the standard of care, she has left Dizon (Clark and the courts) to speculate about what conduct forms the basis of Varkey's health care liability claim against Dizon. This failure renders her opinions inadequate with respect to Dizon. *See Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 748–50 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (concluding that trial court erred in denying hospital's motion to dismiss because export report did not adequately describe the alleged breaches of the standard of care). Though there are some areas where we are free to review medical records unaided by an expert witness's own summations, neither we nor the trial court are granted such latitude in this analysis. *See Norris*, 2006 WL 1459958, at \*2. Under the circumstances,

the trial court did not abuse its discretion in dismissing the Varkey Parties' claims health care liability claims against Dizon.

## 2. The reports fail to provide a good-faith effort to link Nurse Lee's breach in the improper administration of medicine with an alleged injury.

To the extent that Varkey complains that the trial court abused its discretion by dismissing his claims against Nurse Lee for negligence associated with her administration of this medication, we briefly address that issue here. Omission of any of the statutory elements prevents the report from constituting a good-faith effort. *See Jelinek v. Casas*, 328 S.W.3d at 539. According to Chollett's report, Lee deviated from doctor's orders by administering pain medication that was permitted only if Varkey had exhibited higher levels of pain than determined at the time. Chollett's report does not provide a causation opinion, and Clark's report fails to identify Lee, or casually link such conduct with an alleged injury.

In the causation section of Clark's second report, without reference to any specific Nurse, Clark refers to the "administration of pain medication" once but only as causing the nurses to not know how long Mr. Varkey had been lying on the floor. It states:

> The failure to provide this patient with a room sitter, the failure to place the patient in direct view of the nursing station (when possible), the failure to activate the patient's bed alarm, and the failure to adhere to physicians orders when administering pain medications were each substantial acts of negligence that individually or collectively increased the risk of falls and resulted in the nursing staff having no idea just how long Mr. Varkey had been lying on the floor of his hospital room in cardiac arrest before the nurses found him and called a Code Blue.

Even presuming for the sake of argument that Clark's reference to the "the failure to adhere to physicians orders when administering pain medications" adequately identifies Lee (by reference to Chollett's report), Clark's sole reference

14

to such conduct is insufficient as a causation opinion because it fails to connect the breach to any injury. The Varkey Parties had been granted an extension to amend the report as to their claims against Lee, and their amended reports do not explain how her alleged breach in the administration of medication caused any injury alleged by the Varkey Parties, and thus failed to provide the trial court with a basis that a claim under that theory had merit.

**3. The reports are globally deficient on the element of causation.**

One overarching deficiency in Clark's causation opinions leads us to conclude the trial court did not abuse its discretion in granting the two motions to dismiss. Proximate cause encompasses two components: (1) foreseeability and (2) cause-in-fact. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred. *Id.* For the amended report to suffice as to causation, in it Dr. Clark must explain "how and why" the alleged negligence in assessing Varkey's fall risk caused Varkey to suffer a brain injury and die, set forth the basis for his statements, and link his conclusions to specific facts. *See Abshire*, 563 S.W.3d at 224. Thus, for the amended report to survive the challenge, Dr. Clark would have to explain how the allegedly negligent conduct caused Varkey to suffer a brain injury and die. *See id.* at 226.

Neither report concludes that any of the health care providers' acts caused or resulted in Mr. Varkey's heart attack or death. Instead, the reports inversely formulate causation by stating in various ways that were it not for the appellees's breaches Mr. Varkey's care would have improved and he would have had an increased chance of survival and decreased risk of brain injury. Texas cases

15

analyzing causation with similar causal formulations have been held to be inadequate. *See Wright*, 79 S.W.3d at 52–53 (concluding report which stated - "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome" - failed to represent a good-faith effort to summarize the causal relationship between plaintiff's failure to meet the applicable standards of care and Barbara's injury); *Hutchinson v. Montemayor,* 144 S.W.3d 614, 617–18 (Tex. App.—San Antonio 2004, no pet.) (concluding that expert report discussing that injury "may have been avoided" was insufficient to meet statute); *Estate of Allen v. Polly Ryon Hosp. Auth.,* No. 01–04–00151–CV, 2005 WL 497291, at *3, 5 (Tex. App.—Houston [1st Dist.] Mar. 3, 2005, no pet.) (mem. op.) (finding that expert report discussing what was "more likely" or "could have contributed" constituted mere possibilities and thus were not statements of causation).

Clark fails to state what the response time would have been had cardiac monitoring been ordered and properly utilized, or what the response time would have been had Varkey been properly assessed as a high fall risk, or even say that it was more likely than not Varkey would not have suffered severe damage to critical organs had he properly been assessed as a high fall risk or ordered for cardiac monitoring.

When giving the words and terms in Clark's report their plain and ordinary meaning, Clark's report alleges a loss of chance theory of malpractice. Texas does not recognize loss of chance as an independent common law cause of action. *Hodgkins v. Bryan*, 99 S.W.3d 669, 675 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("In *Kramer,* the supreme court held that Texas does not recognize a common law cause of action for lost chance of survival in a medical malpractice case. The lost chance of survival doctrine is a bar to recovery due to lack of

16

causation, not an affirmative defense."). Recovery for a loss of chance requires proof that at the time of the defendant's alleged negligence, there was less than a 50% chance the claimed injuries would have occurred without that defendant's negligence. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 859–61 (Tex. 2009) ("[P]roof that a patient lost *some* chance of avoiding a medical condition or of surviving the cancer because of a defendant's negligence is not enough for recovery of damages"). If the Varkey Parties pursued a loss of chance theory, then as part of their proximate cause showing, they would have needed an opinion showing that there was less than a 50% chance Varkey would have died or suffered a brain injury without the doctor's and/or the nurse's negligence. They did not offer such an opinion.

The two amended expert reports do not contain sufficient information within their respective four corners (or combined eight corners) to (1) inform Nurse Dizon of the specific conduct called into question and (2) provide a basis for the trial court to conclude that the Varkey Parties' claims against Dr. Melhem and the Nurses have merit. *See Baty*, 543 S.W.3d at 693–94; *see also Pinnacle Health Facilities XV, LP v. Robles*, No. 14-15-00924-CV, 2017 WL 2698498, at *2–4 (Tex. App.—Houston [14th Dist.] Jun. 22, 2017, no pet.); *See also Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d at 52–53. Under the applicable standard of review we conclude that the trial court did not abuse its discretion in determining that the two amended reports failed to provide an objective good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *See Pinnacle Health Facilities XV, LP*, 2017 WL 2698498, at *2–4; *Kingwood Pines Hosp., LLC*, 362 S.W.3d at 748–50. Accordingly, we overrule the appellees's sole appellate issue.

### III. NO FURTHER EXTENSIONS

The Varkey Parties had been granted an extension to amend the report as to

their claims against the Nurses, and therefore are entitled to no further extensions as to those claims. Whether the Varkey Parties are entitled to an opportunity to cure their report as to claims against Dr. Melhem is a slightly different question. The Varkey Parties contend that the trial court erred in refusing them an opportunity to cure reports after granting Dr. Melhem's motion. "The Act allows a trial court to grant one 30-day extension to cure a deficiency in an expert report, and a court must grant an extension if a report's deficiencies are curable." *Zamarripa*, 526 S.W.3d at 461. The court did not rule on the timely objection or motion filed by Dr. Melhem until after ruling on the Nurses objections; thus, no previous opportunity to cure the report(s) relevant to the claims against Dr. Melhem had yet been granted. However, in amending their reports following the Nurses objections, the Varkey Parties provided a second report from Dr. Clark which, as discussed above, uses the same deficient language to convey his causation opinion pertaining to the claims against the Nurses as he did in his first opinion pertaining to the claims against Dr. Melhem. Under these circumstances, even if the deficiencies were curable, we cannot conclude that the trial court abused its discretion in denying the Varkey Parties opportunity to cure deficiencies in Dr. Clark's first and second reports.

## IV. Conclusion

For the reasons discussed herein we affirm the trial court's final judgment.


/s/    Randy Wilson
        Justice

Panel consists of Justices Jewell, Spain, and Wilson.

18